**Maurice HOUSTON; Jerome Perkins,**
**Plaintiffs–Appellants,**

v.

**CLARK COUNTY SHERIFF DEPUTY JOHN DOES 1–5; Gene A. Kelley, Clark County Sheriff; Christopher M. Dickens; Steven M. Click; Kenneth A. Hooper; George R. Schutte, Jr., Defendants–Appellees.**

No. 97–3911.

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 28, 1998.

Decided April 23, 1999.

Rehearing and Suggestion for Rehearing En Banc Denied June 7, 1999.*

* Judge Clay would grant rehearing for the reasons in his dissent.

810

Charles A. Smiley, Jr. (argued and briefed), Smiley, Suarez & Associates, Dayton, Ohio, for Plaintiffs–Appellants.

Timothy S. Rankin (argued and briefed), Isaac, Brant, Ledman & Teetor, Columbus, Ohio, for Defendant–Appellee Clark County Sheriff Deputy John Does 1–5.

Steven G. LaForge, Timothy S. Rankin, Isaac, Brant, Ledman & Teetor, Columbus, Ohio, for Defendants–Appellees Gene A. Kelley, Kenneth A. Hooper, George R. Schutte, Jr.

Allen P. Adler, Asst. Atty. Gen. (briefed), Office of the Attorney General, Corrections Litigation Section, Columbus, Ohio, for Defendants–Appellees Christopher M. Dickens, Steven M. Click.

Before: NELSON, CLAY, and GIBSON **, Circuit Judges.

JOHN R. GIBSON, J., delivered the opinion of the court, in which DAVID A. NELSON, J., joined. CLAY, J. (pp. 815–27), delivered a separate dissenting opinion.

## OPINION

JOHN R. GIBSON, Circuit Judge.

In this 42 U.S.C. § 1983 action, plaintiffs Maurice Houston and Jerome Perkins appeal the district court's[1] grant of summary judgment in favor of Clark County Deputy Sheriffs George R. Schutte, Jr., and Kenneth A. Hopper, and Ohio Highway Patrol Troopers Christopher M. Dickens and Steven M. Click.[2] Houston and Perkins alleged that the officers violated their Fourth Amendment rights by stopping their car and detaining them without adequate justification.[3] Because we conclude that the officers did not violate Houston's and Perkins's Fourth Amendment rights, we affirm the judgment of the district court.

## I.

We view the facts in the light most favorable to Houston and Perkins, the parties against whom summary judgment was granted. See Bush v. Dictaphone Corp., 161 F.3d 363, 368 (6th Cir.1998). At about 2:00 a.m. on May 27, 1995, Deputy Schutte was dispatched to Chuck's Rock–N–Ranch in Springfield, Ohio, on a theft call. Shortly after Deputy Schutte reached Chuck's and started to investigate, Deputy Hopper arrived to assist him. Deputies Schutte and Hopper conducted a brief investigation.

As the deputies started to leave Chuck's, and as the bar was closing for the night, numerous fights broke out in the bar's parking lot. When the deputies tried to break up the fights, the crowd attacked them with rocks and bottles. In the midst of this clamor, Deputies Schutte and Hopper heard a thudding or popping noise which they believed to be gunfire, and both heard a voice exclaim, "He's been shot." Deputy Schutte soon noticed an individual—later found to be a security guard—lying on the ground near him. The security guard was bleeding profusely from the head, and Deputy Schutte believed that he had been shot and was likely dead.' Nearby, Deputy Schutte saw someone get into a car that left the scene and sped off on Columbus Road toward Burnett Road. Deputy Schutte suspected that the victim had been shot by the individual who entered the car that sped off from the scene. Meanwhile, Deputy Hopper could not find Deputy Schutte and believed that his partner may have been shot. He radioed this information to the dispatcher and requested further assistance.

Soon thereafter, Deputy Hopper approached his cruiser and heard a radio message from Deputy Schutte that someone had been shot and that a suspect was leaving the scene in a car headed toward Burnett Road. Deputy Hopper entered his car and also headed toward Burnett Road. Deputy Schutte's description of the suspect's car was sketchy at best. Due to the time of night, the frantic situation outside the bar, and dust that blew up from the

** The Honorable John R. Gibson, Circuit Judge of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

1. The Honorable Michael R. Merz, United States Magistrate Judge for the Southern District of Ohio. Pursuant to 28 U.S.C. § 636(c) (1994), the parties consented to plenary magistrate jurisdiction.

2. Although Houston and Perkins's notice of appeal referred generally to the entire judg-

ment, in their brief they do not seek reversal of the district court's judgment with respect to Troopers Click and Dickens.

3. Houston and Perkins also sued Clark County Sheriff Gene A. Kelly, but they do not appeal the grant of summary judgment in Kelly's favor. In addition, appellants pursued numerous state causes of action against the officers. These were rejected by the district court and have been abandoned on appeal.

ground as a result of the general disorder in the parking lot, Deputy Schutte was unable to identify the suspect's car's make, model, color, license plate, or its passengers. Instead, Deputy Schutte could only notice the shape of the car's taillights as the car sped away. As Deputy Hopper passed Deputy Schutte, the latter radioed the number of cars between Deputy Hopper's vehicle and the suspect's.

Deputy Hopper, however, misunderstood Deputy Schutte's method of identifying the suspect's vehicle. Deputy Hopper thought that Deputy Schutte was talking about the number of vehicles between the suspect's car and the intersection at Columbus and Burnett Road, instead of the number of vehicles between Deputy Hopper and the suspect's vehicle. He stopped the "marked" vehicle after it turned left onto Burnett Road. That vehicle was occupied by the plaintiffs, Houston and Perkins, who had indeed left Chuck's minutes earlier. Deputy Hopper drew his gun and ordered Houston and his passenger, Perkins, to throw the car's keys out the window and to get out of the car.

About this time, Troopers Dickens and Click arrived to assist Deputy Hopper. While en route to Chuck's to help quell the disturbance there, the troopers had heard a message over their radio that a police officer had been shot at the bar. They soon heard a subsequent message that the "suspects" in the shooting had been stopped on Burnett Road. Troopers Dickens and Click saw Deputy Hopper ordering Houston and Perkins out of the car, and they lent their assistance—believing that the men were suspects in the shooting of a police officer. Houston and Perkins at first failed to comply with Deputy Hopper's orders to throw out the keys and get out of the car. When Trooper Dickens arrived at the scene, he alighted from his cruiser, drew his gun, and aimed it at Perkins. Meanwhile, Trooper Click drew his shotgun and aimed it at Perkins. Houston threw the keys out of the car, and both men got out of the car and lay on the

ground as they were ordered. They were both handcuffed and placed in the cruisers. Once Houston and Perkins were secured, Trooper Dickens left the scene and headed for Chuck's. Deputy Hopper explained to Houston and Perkins that there had been a shooting at Chuck's, and he asked permission to search Houston's car. When asked, Houston denied that he had a gun. He consented to a search of the car, and the officers did not find any weapons.

Back at Chuck's, meanwhile, Deputy Schutte and others searched the scene for casings and a weapon. They found none, but located a broken bottle near where the security guard had been lying before he was taken to a hospital. The officers at Chuck's therefore inferred that no one had been shot, but that the victim had been hit by a bottle. When Deputy Hopper radioed Deputy Schutte in order to get a description of the suspect who had fled in the car, Deputy Schutte told him that he could not describe the suspect and that a shooting likely never occurred. Nevertheless, Deputy Hopper still suspected that Houston and Perkins were involved in the assault on the security guard. Deputy Hopper continued to question Houston and Perkins, who denied any involvement. No further evidence implicated the two men, and Deputy Hopper released them. Houston and Perkins estimated the length of the detention as about one hour, although the Highway Dispatch logs show that thirty-three minutes elapsed between the time of the "shots fired" call to the time of clearing the scene at Burnett Road.

Houston and Perkins sued the officers under 42 U.S.C. § 1983, alleging that both the stop of their vehicle and their subsequent detention violated the Fourth Amendment. Specifically, they alleged that the initial stop of their car was not supported by any reasonable suspicion that Houston and Perkins had committed a crime. Further, they charged that the officers' detention of them—including the use of weapons and handcuffs—transformed the investigative stop into an ar-

rest that was not supported by probable cause. The district court rejected both of these arguments, holding that the officers had reasonable suspicion to stop Houston's vehicle and that the subsequent investigation did not ripen into an arrest. In the alternative, the district court absolved the defendants of liability on the basis of qualified immunity. This appeal followed.

## II.

On appeal, Houston and Perkins essentially reiterate the arguments they made below. They first take issue with the stop of their vehicle. Even if the officers reasonably believed that a crime occurred, it is argued, the officers had no reason to suspect that Houston and Perkins had committed it. Because Deputy Schutte radioed Deputy Hopper before troubling to interview any eyewitnesses in the parking lot, saw another car leave Chuck's at the same time as the suspect's car, was never certain that he had heard gunfire, and used an inherently unreliable method to identify and keep track of the suspect's car, the entire stop was based on mere speculation. We are not persuaded.

■ Police may briefly stop an individual for investigation if they have a "reasonable suspicion" that the individual has committed a crime. *United States v. Palomino,* 100 F.3d 446, 449 (6th Cir.1996). The same Fourth Amendment test applies to vehicle stops. *See Delaware v. Prouse,* 440 U.S. 648, 663, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979); *Palomino,* 100 F.3d at 449. "Reasonable suspicion" is more than an ill-defined hunch; it must be based upon "a particularized and objective basis for suspecting the particular person ... of criminal activity." *United States v. Cortez,* 449 U.S. 411, 417–18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). It requires "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" an investigatory stop. *Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *United States v. Erwin,* 155 F.3d 818, 822 (6th Cir.1998),

*cert. denied,* —— U.S. ——, 119 S.Ct. 906, 142 L.Ed.2d 904 (1999). The standard outlined in *Terry* and its progeny is not onerous. The requisite level of suspicion "is considerably less than proof of wrongdoing by a preponderance of the evidence." *United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989); *McPherson v. Kelsey,* 125 F.3d 989, 993 (6th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1370, 140 L.Ed.2d 518 (1998). Moreover, reasonable suspicion can arise from evidence that is less reliable than what might be required to show probable cause. *Alabama v. White,* 496 U.S. 325, 330, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990); *McPherson,* 125 F.3d at 993. Based upon our assessment of the "totality of the circumstances," we review *de novo* the question of whether such reasonable suspicion existed. *United States v. Avery,* 137 F.3d 343, 348, 350 (6th Cir.1997). We conclude that it did.

■ Viewing the totality of the circumstances, we are convinced that all four officers reasonably believed that a crime occurred at Chuck's and possessed a reasonable suspicion (to be sure, a mistaken one) that the occupants of Houston's car were involved in that crime. Turning first to Deputy Schutte, he observed and was assaulted in an uprising at Chuck's, heard a sound that resembled gunfire, heard a voice exclaim, "He's been shot," observed a victim bleeding profusely from the head, noticed a passenger enter a car next to the victim, watched the same car speeding away from the bar's parking lot, and identified the vehicle as best he could under hurried and otherwise difficult circumstances. These "specific and articulable facts," along with rational inferences therefrom, linked the crime at Chuck's to the vehicle that Deputy Schutte identified. Police officers are "regularly forced to make critical decisions under extreme pressure," *Pray v. City of Sandusky,* 49 F.3d 1154, 1159 (6th Cir.1995) (citation omitted). Had Deputy Schutte conducted a more prolonged investigation in the bar's

parking lot—rather than sending a radio message to his partner that the suspects were driving away—the most promising lead in the investigation of a serious felony could have quickly evaporated.

Likewise, Deputy Hopper's actions were premised upon a reasonable suspicion that the occupants of Houston's car were involved in a shooting at Chuck's. Deputy Hopper witnessed the uprising outside Chuck's that night, heard a sound that he believed was gunfire, and heard a shout that someone had been shot. He reasonably believed his partner's radio message to the effect that suspects in the crime were driving away from Chuck's toward Burnett Road. *See McPherson,* 125 F.3d at 993–94 (officer may formulate reasonable suspicion based on information obtained from fellow officers). Deputy Hopper merely misunderstood his partner's car-counting method. Despite the unfortunate consequences of Deputy Hopper's mistake, we do not think that the mistake itself is of constitutional dimension. *See United States v. Shareef,* 100 F.3d 1491, 1505–06 (10th Cir.1996) (mistaken premise can justify *Terry* stop if officer acted reasonably upon it). Further, we do not believe that car-counting itself is so inherently unreliable as to preclude the possibility that the deputies reasonably suspected the car's occupants of a crime. Deputy Hopper stopped Houston's car not because of a hunch, but rather based on "reasonable and articulable facts" (and inferences drawn reasonably but incorrectly therefrom) regarding the car's relative position among others on the same road.

As we have observed, Houston and Perkins do not seek reversal of the judgment in favor of Troopers Click and Dickens. On numerous occasions in their briefs, however, they attack the legality of the troopers' conduct, but in view of the relief they seek on this appeal, we need not discuss the conduct of Troopers Click and Dickens in detail. We are convinced, however, that their participation in the series of events did not violate the Constitution.

## III.

We also reject the appellants' argument that the investigative stop ripened into an arrest that required probable cause that Houston and Perkins had committed a crime. Houston and Perkins contend that an arrest occurred, pointing to the use of weapons and handcuffs as well as their forced placement into police cruisers. In addition, they argue that the total length of the detention exceeded that of an investigative stop, that the detention wrongfully extended some twenty minutes beyond the time that the officers surmised that no shooting had occurred at Chuck's, and that the two should have been released when the officers determined that they had no weapons. Again, we are not convinced.

An investigative *Terry* stop may indeed ripen into an arrest through the passage of time or the use of force. *See United States v. Sharpe,* 470 U.S. 675, 685–86, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985); *Centanni v. Eight Unknown Officers,* 15 F.3d 587, 590 (6th Cir.), *cert. denied,* 512 U.S. 1236, 114 S.Ct. 2740, 129 L.Ed.2d 860 (1994). When this occurs, the continued detention of suspects must be based upon probable cause. *United States v. Avery,* 137 F.3d 343, 349 (6th Cir.1997). Although there is no bright line that distinguishes an investigative stop from a *de facto* arrest, *Florida v. Royer,* 460 U.S. 491, 506, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983); *Centanni,* 15 F.3d at 590, the length and manner of an investigative stop should be reasonably related to the basis for the initial intrusion. *United States v. Palomino,* 100 F.3d 446, 449 (6th Cir. 1996).

Under these standards, we see no Fourth Amendment violation in the conduct of Deputy Hopper and Troopers Click and Dickens. Specifically, when police officers reasonably fear that suspects are armed and dangerous, they may order the suspects out of a car and may draw their weapons when those steps are "reasonably

necessary for the protection of the officers." *United States v. Garza,* 10 F.3d 1241, 1246 (6th Cir.1993). Further, detention in a police cruiser does not automatically transform a *Terry* stop into an arrest. *See, e.g., United States v. Critton,* 43 F.3d 1089, 1092–94 (6th Cir.), *cert. denied,* 514 U.S. 1121, 115 S.Ct. 1987, 131 L.Ed.2d 873 (1995), 514 U.S. 1129, 115 S.Ct. 2004, 131 L.Ed.2d 1004 (1995). Nor does the use of handcuffs exceed the bounds of a *Terry* stop, so long as the circumstances warrant that precaution. We have so held in two unpublished opinions. *See United States v. Walker,* 51 F.3d 274 (table), No. 94–3521, 1995 WL 141343, at *5 (6th Cir. March 31, 1995), *cert. denied,* 515 U.S. 1150, 115 S.Ct. 2594, 132 L.Ed.2d 841 (1995); *United States v. Monhollen,* 145 F.3d 1334 (table), No. 97–5855, 1998 WL 152934, at *2 (6th Cir. March 24, 1998) (officers may use handcuffs while securing the area during *Terry* stop); *see also United States v. Perdue,* 8 F.3d 1455, 1463 (10th Cir.1993) (precautionary measures, including handcuff usage, do not necessarily transform *Terry* stop into arrest). *Perdue* cites cases from six other circuits to this same effect. *Id.* Here, Deputy Hopper and Troopers Click and Dickens drew and aimed their weapons based upon the reasonable belief that the car's occupants had been involved in a shooting (in the troopers' case, the shooting of a police officer). Moreover, based upon the facts known to the officers at the time of the stop, their use of handcuffs and their detention of the men in the cruisers were both reasonably necessary to protect the officers' safety during the investigation. These precautions were therefore "reasonably related" to the investigation that warranted the initial stop.

▮ The length of the stop presents a closer question, but we still discern no Fourth Amendment violation. There is no rigid time limit for a *Terry* stop. *Garza,* 10 F.3d at 1246. When an officer's initial queries do not dispel the suspicion that warranted the stop, further detention and questioning are appropriate. *See, e.g., Palomino,* 100 F.3d at 450. In this case, even after the officers searched the car, found no weapon, and discovered that no shooting had occurred at Chuck's, the officers still reasonably suspected Houston and Perkins of involvement in a serious and violent crime. The investigative stop included several steps, all of them reasonably necessary to ensure the officers' safety or to confirm or dispel their suspicions: pulling over the vehicle, forcing the suspects to exit the car, patting down the suspects, physically restraining then questioning them about the events at Chuck's, confirming their identities by completing "field investigation cards," thoroughly searching their car for weapons, and sending and receiving various communications to and from the officers at the crime scene. It is not surprising or disturbing that these steps would together last thirty-five minutes (as the defendants claim) or even an hour (as Houston and Perkins maintain). In either case, we conclude that the officers' inquiries and safety precautions were reasonably related to the initial basis for stopping the car. *See Michigan v. Summers,* 452 U.S. 692, 700 n. 12, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981) ("If the purpose underlying a *Terry* stop—investigating possible criminal activity—is to be served, the police must under certain circumstances be able to detain the individual for longer than the brief time period involved in *Terry* . . . ").

Under these facts, neither the force used against Houston and Perkins nor the length of their detention exceeded the permissible scope of a *Terry* stop. Because we hold that the initial stop and subsequent detention of Houston and Perkins did not violate the Fourth Amendment, we do not reach the issue of qualified immunity.

The judgment of the district court is affirmed.

CLAY, Circuit Judge, dissenting.

The controverted factual circumstances surrounding the apprehension and deten-

tion of Plaintiffs should easily have resulted in the district court's denial of Defendants' motion for summary judgment. Nevertheless, the majority, in approving the investigatory seizure and subsequent arrest of these Plaintiffs without reasonable suspicion or probable cause, lends its stamp of approval to a series of unreasonable errors committed by the officers of Clark County in what might appear to constitute undue deference to their subjective good faith. In so doing, the Court lowers the high standard of professionalism we are entitled to expect of our nation's law enforcement officers charged with guarding the civil rights of all they encounter. I therefore respectfully dissent.[1]

## I.

### A.

Under Rule 56(c) of the Federal Rules of Civil Procedure, a district court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue of fact is "genuine" under this standard if "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Significantly, summary judgment is improper if there is sufficient evidence to believe there exists more than one version of the facts, and the evidence requires "a jury or judge to resolve the parties' differing versions of the truth at trial."*First Nat. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–89, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968).

Accordingly, a district court should not grant summary judgment if doing so would require it to make findings of fact or "if

reasonable minds could differ about the import of the evidence." *Anderson*, 477 U.S. at 250, 106 S.Ct. 2505. Indeed, "[c]redibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict." *Id.* at 255, 106 S.Ct. 2505; *Williams v. Nashville Network*, 132 F.3d 1123, 1131 (6th Cir.1997) (observing that the judgment of the court "should not be substituted for that of the jury"). Thus, even where a particular set of operative facts is not in dispute, two very different inferences may arise from those facts; in such situations, courts may not usurp "exclusive functions of the trier of fact" by improperly assigning weight to some evidence while discounting the relevance of other evidence, or by crediting certain aspects of witness testimony while dismissing other facets of witness testimony in deciding whether to grant summary judgment. *See Hanover Ins. Co. v. American Eng'g Co.*, 33 F.3d 727, 732 (6th Cir. 1994). Instead, the court must view any and all reasonable inferences from the totality of the evidence in the light most favorable to the parties opposing the motion for summary judgment. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

### B.

A closer look at the facts, taken in the light most favorable to Plaintiffs, is crucial to an understanding of how, by improperly adjudicating the weight and credibility of the evidence presented, the majority has come to the wrong conclusion in this case. Around 2:00 a.m. on May 27, 1995, the security guard at Chuck's Rock–N–Ranch ("Chuck's") in Springfield, Ohio, spotted two individuals wanted for theft at Chuck's, and called the Clark County Sheriff's department. Deputy Schutte re-

---

1. Since Plaintiffs do not appeal the dismissal of their case against Troopers Click and Dick-
ens and Sheriff Kelly, I address here only the liability of Deputies Schutte and Hopper.

sponded to the call and had already begun to investigate when Deputy Hopper arrived on the scene. The deputies detained the two suspects in the Chuck's parking lot. As the deputies questioned the suspects, two fights broke out in the parking lot within approximately ten or fifteen feet of one another. Deputy Hopper radioed his dispatcher and asked for two backup cars. Because the fights were separate, the deputies split up, so that each could investigate or quell a fight. Another fight then broke out, and the crowd began to swarm around the officers and began to stone the officers. As Deputy Hopper explained, "the crowd just rips loose and then we're starting to get rocked. Then I tell my dispatchers just to send everybody, we're getting rocked." (Hopper Dep. at 7.) When the fights broke out, Plaintiffs were inside Chuck's.

During this chaos, someone assaulted Deputy Schutte, knocking him to the ground. When he came to his senses, Deputy Schutte saw the man he believed had assaulted him run into a vacant, fenced lot on the west side of Chuck's. As Deputy Schutte explained, the suspect "was already over the fence and running across the street when I got to it." (Schutte Dep. at 21.) Although the area surrounding the fence was blocked and obscured by trees standing slightly above his head, together with thick weeds, scrub bushes, and piles of rocks and old tires, Deputy Schutte was able to watch as the suspect jumped into the car across the street and as the car 'pulled away and began down the road. Deputy Schutte later described the suspect's vehicle in an incident report as "brown or beige in color, possibly an old Buick, full size, older model," and as bearing the license plate number "ROA–209." (Schutte Dep. at 22.)

After he saw the suspect's vehicle pull away, Deputy Schutte turned from the fence and began to walk back through the brush towards Chuck's. He had walked about 150 or 200 feet when he heard "a loud noise … like a thumping or pop-ping." (Schutte Dep. at 23.) Deputy Schutte ran towards the end of the fence and turned the corner, because he otherwise could not see through the brush. After rounding the corner, he saw a security guard lying on the ground and saw a car with a door open pulling away from the right side of the road—the side the security guard was on—and headed towards Burnett Road. As Deputy Schutte explained, he ran towards the security guard while watching the taillights at the same time, keeping the security guard in his vision the entire time. Deputy Schutte observed that while the area was dark but lit, there was a "lot of dust because of all the cars and all the mayhem that was going on beforehand." (Schutte Dep. at 32.) He thought the car was "leaving in a hurry." (Schutte Dep. at 31.)

The security guard was "flopping around on the ground" but was not speaking. (Schutte Dep. at 23.) Another person, who had climbed over the fence, screamed that the security guard had been shot. Deputy Schutte and this other individual turned the security guard over and saw "he had a perfect hole right … in the center of his forehead and he had blood pumping out of it and I had no reason to believe he wasn't shot." (Schutte Dep. at 33.) Deputy Schutte radioed Deputy Hopper that a security guard appeared to have been shot. At the same time, Deputy Schutte claims he both kept his eyes on the taillights of the car that had driven away, and kept count of the cars that passed by. Deputy Schutte did not know how many cars were ahead of the taillights he was watching. Deputy Schutte stated that he could no longer see the taillights as the car approached the intersection of Burnett Road, approximately four or five blocks away.

Deputy Hopper had also heard a "thump or a bang" and a cry that someone had been shot. (Hopper Dep. at 14.) He was concerned because he did not know the whereabouts of Deputy Schutte. Deputy Hopper began to head towards his car to

contact the dispatcher when he heard the radio call from Deputy Schutte. Deputy Schutte told Deputy Hopper that someone had been shot and that the alleged shooter had escaped in a car that was "X amount of cars back." (Hopper Dep. at 16.) Deputy Schutte did not disclose his own location to Deputy Hopper. Nevertheless, Deputy Hopper took Deputy Schutte's communication to mean that the car was "X amount of cars ... back from the light." (Hopper Dep. at 16.) Deputy Hopper believes the number Deputy Schutte gave him was five. In reality, because Deputy Schutte had lost track of the taillights after a few blocks, he attempted to give Deputy Hopper the number of cars that passed between the suspect vehicle and Deputy Hopper's vehicle, and to give updates of that count. He could not give Deputy Hopper any description of the car other than that relative location.

As Deputy Hopper began to pull his car around to Columbus Road, a number of cars began to leave Chuck's because of the chaos, and their lights came on. Because the traffic on the right side of the road was building up, Deputy Hopper got on the left side of the road going in the same direction to pursue the vehicle he believed was the one carrying the alleged shooter. On his way to catch the suspect, Deputy Hopper passed the security guard lying on the ground, and believed at that point that he was just two car lengths behind the suspect's vehicle. Deputy Hopper pulled up to the car he believed might be the getaway car, signaled the driver to stop, and drew his gun. This driver of this car was Maurice Houston, and the passenger was Jerome Perkins.

He walked over to the driver's side of the car and shouted at Houston and Perkins to shut the ignition off and throw the keys out, and to get out and lay down in the street. Houston and Perkins instantly complied with Deputy Hopper's request.[2] At that moment, Ohio State Trooper Dickens arrived at the scene in response to Deputy Schutte's radio call, stopped his car in front of Plaintiffs' car, and drew his gun on Perkins. Another Ohio State Trooper, Click, arrived in response to Deputy Schutte's call and saw Houston lying on the ground by the driver's side of the car, and Perkins lying on the sidewalk. Trooper Click exited his patrol car with his gun drawn, checked to be sure that Trooper Dickens was unharmed, and held his weapon to Perkins until he was handcuffed, patted down and brought back to his feet. The officers placed Perkins in the back of Trooper Click's patrol car.[3] Trooper Dickens departed the scene at this point and headed for Chuck's. It took him less than one minute to reach Chuck's from the point on the road where the other officers had detained Plaintiffs. A few minutes after he arrived at Chuck's, he learned that the security guard that lay bleeding on the ground had not been shot, but had been hit over the head with a beer bottle, and that no one had been shot. Trooper Dickens informed the dispatcher that no one had been shot.

Deputy Hopper also handcuffed Houston, telling him there had been a shooting at Chuck's and that the police believed his car to be the one involved. Deputy Hopper then placed Houston in the back seat of his patrol car and read him his *Miranda* rights. Deputy Hopper asked Houston if he had a gun in the car, and Houston responded that he did not. Deputy Hopper then asked Houston if he could search

**2.** Deputy Hopper reported that he ordered Houston and Perkins to throw the keys to the car out the window three times before they complied, and that they did not do so until Trooper Dickens arrived and exited his vehicle with his gun drawn. He further reported that Houston dropped to the ground only after Deputy Hopper asked him twice.

**3.** Trooper Click denies that Perkins was placed in his patrol car, and opined that Perkins was not placed in Trooper Dickens' vehicle either. However, in his report on the incident, Deputy Hopper stated that Perkins was placed in a state trooper vehicle.

the car, and Houston consented. Houston also told Deputy Hopper that Perkins did not have a gun. Deputy Hopper and Trooper Click then searched the car for ten to fifteen minutes, checking the glove compartment, the seats, the floor and the trunk.

After the search, Deputy Hopper radioed Deputy Schutte to see if anyone could identify the shooter. By this time, Deputy Schutte had determined that the security guard had not been shot. Officers searching the scene found no bullet casings, but found a broken bottle. The guard could not give a description of the suspect that assaulted him, and when Deputy Hopper radioed for a description of the suspect, Deputy Schutte could not give him one. After speaking with Deputy Schutte, Deputy Hopper further detained Plaintiffs, asking them questions about the broken bottle assault at Chuck's and completing field investigation cards on them. Because Plaintiffs could not provide any relevant information about the assault, the police released them. Plaintiffs claim the detention lasted from forty-five to sixty minutes, although thirty-three minutes elapsed from the time when Troopers Click and Dickens received a "shots fired" call to the time they cleared the scene.

## II.

There is no dispute in this case that the officers who stopped and detained Plaintiffs acted on the basis of a radio call made by Deputy Schutte. Although the officers who carried out the detention in this case did not have personal knowledge of facts giving rise to suspicion as to Plaintiffs' vehicle, they were entitled to rely on the bulletin sent by Deputy Schutte in stopping Plaintiffs only so long as (1) Deputy Schutte could articulate particular facts supporting a reasonable suspicion that Plaintiffs had committed the offense at Chuck's, and (2) the officers' reliance on his bulletin was objective. See United States v. Hensley, 469 U.S. 221, 232–33, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985); see

also United States v. Roach, 958 F.2d 679, 682 (6th Cir.1992). If Deputy Schutte could support his suspicion with reasonable articulable facts, and if in turn the communication from Deputy Schutte provided an objective, adequate factual basis to the other officers for stopping Plaintiffs, see United States v. Nafzger, 974 F.2d 906, 912 (7th Cir.1992), then the Fourth Amendment required the officers to limit the scope and duration of the stop to checking out the suspicious circumstances that led to the original stop. See United States v. Obasa, 15 F.3d 603, 607 (6th Cir.1994). If the officers exceeded this limitation, the stop ripened into an arrest requiring them to possess probable cause. See United States v. Thomas, 11 F.3d 620, 626 (6th Cir.1993). Viewing the entire body of facts through the prism of these substantive standards, see Anderson, 477 U.S. at 253, 106 S.Ct. 2505, it is clear that material factual disputes exist about whether the officers in this case acted within the bounds of the Constitution. In Part II.A, I will address the genuine issues of fact as to whether the officers had reasonable suspicion to stop Plaintiffs' vehicle, and will then turn in Part II.B to the factual uncertainties surrounding whether the actions taken by the officers during their investigatory detention of Plaintiffs amounted to arrest without probable cause.

### A.

The Supreme Court has recognized that "reasonable suspicion, like probable cause, is dependent upon both the content of information possessed by police and its degree of reliability. Both factors—quantity and quality—are considered in the 'totality of the circumstances—the whole picture.'" Alabama v. White, 496 U.S. 325, 330, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990) (quoting United States v. Cortez, 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)). An officer's assessment of a situation should yield a "particularized suspicion that the particular individual being

stopped" is the one who has engaged in wrongdoing. *Cortez*, 449 U.S. at 418, 101 S.Ct. 690. The Fourth Amendment demands this level of specificity in the information upon which police officers predicate their actions; indeed, it is the "central teaching" of Fourth Amendment jurisprudence. *See Terry*, 392 U.S. at 22 n. 18, 88 S.Ct. 1868. Accordingly, for an officer to have reasonable suspicion to stop an individual, he must not only have reason to believe that a crime took place, but must also have specific articulable reasons to believe that the particular individual he suspects was in fact involved in that crime.

In the instant case, Deputy Schutte claims that he had reasonable articulable suspicion to believe that Plaintiffs committed the assault at Chuck's because he heard a "thumping or popping" sound and a cry that someone had been shot, saw a passenger enter a vehicle near where the assault victim lay bleeding, watched the taillights of the vehicle pulling away from the area for as far as four blocks, and counted cars between that vehicle and his own position in an effort to keep track of it. However, considering the totality of the circumstances as we must, it is significant that the situation at Chuck's was that of such "mayhem" that when Deputy Schutte radioed Deputy Hopper about an alleged shooting, Deputy Hopper could not figure out where Deputy Schutte was. As Deputies Schutte and Hopper disclosed, the chaos at Chuck's soon resulted in the departure of many people, which in turn led to the presence of numerous cars in the area at the time. There were so many cars departing from Chuck's at that time that the cars on Columbus Road appeared to Deputy Hopper to be "lined up" so that he had to drive on the wrong side of the road to apprehend Plaintiffs' vehicle. (Hopper Dep. at 18.)

Given this scenario, it is not clear what specifically Deputy Schutte observed about the particular car that he identified except that it happened to pick up a passenger from a location close to that of the victim.

Moreover, the car appears from the record to have joined heavy traffic rather than attempt to escape the scene of what Deputy Schutte presumed to be an attempted homicide. While the majority characterizes the facts as "specific and articulable," they are lacking in the one respect that ensures our Fourth Amendment freedoms: particularity. While Deputy Schutte had reason to believe a crime had taken place, his reasons for suspecting the vehicle that he suspected seem so murky as to constitute an "inchoate and unparticularized suspicion or 'hunch.'" *Terry*, 392 U.S. at 27, 88 S.Ct. 1868.

Setting aside the fact that many persons were entering vehicles and pulling away from the area at the time the assault took place and immediately thereafter, I disagree with the majority that the facts offered by Deputy Schutte to support his suspicion were truly "specific" in nature. While Deputy Schutte claimed to have been watching the vehicle in question as it pulled away, he could not identify the year, model, color or license plate of the car. I find this noteworthy, since only moments earlier Deputy Schutte dutifully recorded the license plate number and a detailed physical description of a vehicle across the street from where he was standing that he observed through a fence blocked by trees, bushes, and various other debris. Indeed, despite what appears to have been an unobstructed view, he could offer no physical description of the suspected car or its occupants at all.

Instead, the single fact that Deputy Schutte offered to identify the vehicle he asked Deputy Hopper to detain was the number of vehicles that came between that vehicle and his own position. However, Deputy Schutte claims that while he "counted cars" and looked for Deputy Hopper's vehicle, he turned the assault victim over from back to front, watched blood gush from a hole in the victim's forehead, and radioed Deputy Hopper. Deputy Schutte also watched the taillights of the car he suspected, but did not know

how many other cars were on the road in front of the taillights he watched. Moreover, according to Deputy Schutte's own testimony, he continued to give Deputy Hopper a car count even after he lost track of the car he had singled out. Indeed, as he described it:

The suspect vehicle's taillights immersed with the cars in following behind it as I was standing there and they were all coming up to the light and stopping, yes. . . . I couldn't see specifically the vehicle or where it was or anything else or if it had made the turn or anything like that, no.

(Schutte Dep. at 56.) Despite his admission that he lost track of the vehicle as it approached the traffic light, Deputy Schutte "continued to tell [Deputy Hopper] the count even not knowing for sure if he heard it, even when he got up to the traffic light and went on through the traffic light." (Schutte Dep. at 56.) Finally, even as he gave Deputy Hopper a car count, Deputy Schutte never specified to Deputy Hopper what he meant when he cryptically stated that the suspect was "X cars back."

While the majority characterizes this weak identification as the best Deputy Schutte could do "under hurried and otherwise difficult circumstances," I venture to suggest that these kinds of conditions often exist in police work but do not as a general rule excuse the reasonable suspicion requirement of the Fourth Amendment. Rather, the presence of hurried or exigent circumstances excuses only the requirement that the police obtain a warrant authorizing their temporary "seizure" of a private citizen, and not the requirement that the police possess reasonable suspicion before they make an investigative stop. *See Terry*, 392 U.S. at 27, 88 S.Ct. 1868. Moreover, in our prior cases, particularized and articulable facts giving rise to reasonable suspicion to detain a vehicle have included at least some detail in the description of the vehicle or its occupants. *See, e.g., United States v. Copeland*, 51 F.3d 611, 614 (6th Cir.1995) (noting that police had description of vehicle and license plate number); *Roach*, 958 F.2d at 682 (noting that police had observed occupants of and damage to vehicle). Given the present contours of the "reasonable suspicion" requirement, I find deficient the procedure that Deputy Schutte used to identify a particular vehicle as one carrying criminal suspects, as the quantity of information was scant and the quality of the available information was highly unreliable.

It is troublesome that the majority does "not believe that car-counting itself is . . . inherently unreliable." The recklessness of this tactic is evident not only from the gross miscalculation that occurred in this case, but also from the extreme difficulty one faces when attempting to describe what "counting cars" entailed for Deputy Schutte. Particularly since there were numerous blocks and heavy traffic on the street in question, it is possible that another car changed lanes or merged into lanes so as to disturb the car count in the moments Deputy Schutte turned over and studied the assault victim or checked to see if a passing car was that of Deputy Hopper. As Deputy Schutte himself admitted, the traffic eventually merged together so that he lost track of the suspected vehicle. Indeed, for an officer to reliably count cars using this method, that officer would have to simultaneously (1) count the number of vehicles passing his own position, (2) ensure that no other vehicles entered the road beyond his own position, and (3) watch for the police cruiser of a fellow officer to pass.

For similar reasons, I would not characterize the reliance of Deputy Hopper on Deputy Schutte's radio bulletin as "objective." While the Supreme Court has not specified the meaning of the term "objective reliance," courts have interpreted the requirement to mean that an officer's reliance on a radio bulletin in making an investigative stop "must be objectively reasonable: did the facts available to the offi-

cer at the time of the *Terry* stop warrant a reasonable belief that the action was appropriate?" *United States v. Longmire,* 761 F.2d 411, 416 (7th Cir.1985). Significantly, the facts reveal that at the time he received the radio call from Deputy Schutte, Deputy Hopper had no idea where Deputy Schutte was. Despite his lack of knowledge in this respect, Deputy Hopper acted on a communication from Deputy Schutte that the suspected vehicle was five "cars back." Deputy Hopper admits that he never ascertained the exact location of Deputy Schutte and did not ask what Deputy Schutte meant by the description "X cars back." The unreasonableness of Deputy Hopper's reliance on such vague and incomplete information is patent, particularly in that Deputy Hopper misunderstood Deputy Schutte to mean "X cars back from the light." Even if this was what Deputy Schutte had meant, Deputy Hopper could not reasonably have known which light Deputy Hopper was talking about without having any idea of his location. Moreover, when Deputy Hopper turned onto Columbus Road, he observed numerous cars leaving the area surrounding Chuck's and entering the road but never realized that in the time that it took him to arrive at Columbus Road, other cars may have cut off the suspected vehicle, thus disturbing the count that Deputy Schutte had given him.

Therefore, while reliance on radio bulletins issued by other officers can be legitimate, I simply do not find reasonable Deputy Hopper's reliance on the incoherent information provided by Deputy Schutte. The majority attempts to bolster the reasonableness of Deputy Hopper's actions by pointing out that he witnessed the mayhem at Chuck's, heard a sound that he characterized as a "thump or bang," and heard a cry that someone had been shot. Not one of these facts, however, could have helped Deputy Hopper suspect that the car he followed and ultimately detained was the one carrying the perpetrator of the assault that had taken place. Indeed, while Deputy Hopper could certainly articulate facts

as to his suspicion that a crime had taken place, Deputy Hopper never saw the vehicle that Deputy Schutte suspected and could not, without the information provided by Deputy Schutte, articulate facts as to his suspicion that individuals in a particular vehicle had committed that crime.

Under these circumstances, I conclude that both the bulletin and the reliance placed on it by Deputy Hopper were unreasonable, and could not constitute grounds for an investigative stop in this case. Construing the facts in the light most favorable to plaintiffs, reasonable minds could certainly differ on the conclusion of the majority that Deputy Schutte did not have reasonable, articulable facts to suspect the car that he did, that the car counting procedure employed by Deputy Schutte was so unreliable as to fail to meet the constitutionally mandated standard of reasonable suspicion, and that the reliance placed by Deputy Hopper on clearly incomplete information was unreasonable. Therefore, I believe genuine issues of fact exist as to whether Deputies Hopper and Schutte had reasonable articulable suspicion to stop Plaintiffs vehicle, and find the granting of summary judgment in this matter to be erroneous.

**B.**

Even if Deputy Schutte could support his suspicion of Plaintiffs' vehicle with reasonable, articulable facts particular to that vehicle, and even if Deputy Hopper was reasonable in relying on the little information he received from Deputy Schutte, I further disagree with the majority in that I believe what began as an investigative stop ripened into an arrest requiring the officers to have probable cause. The Supreme Court has recognized that officers may stop individuals they suspect of having committed a crime to conduct a brief investigation of the circumstances giving rise to their suspicion. *See Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). While such stops must be

brief, there is no bright line rule defining the length of a permissible *Terry* stop. *See United States v. Sharpe*, 470 U.S. 675, 685–86, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985). Rather, the circumstances giving rise to the initial stop determine the scope of activities permitted during an investigative stop; accordingly, during such a stop, "the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions.... [U]nless the detainee's answers provide the officer with probable cause to arrest him, he must then be released." *See Berkemer v. McCarty*, 468 U.S. 420, 439–40, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984). When police action goes beyond an investigation into the circumstances leading to the stop, the detention becomes an arrest that must be supported by probable cause. *See Dunaway v. New York*, 442 U.S. 200, 207, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979).

To determine whether a suspect is under arrest, courts must ask whether a reasonable person in the suspect's position "would have felt that he was under arrest or 'otherwise deprived of his freedom of action in any significant way.'" *United States v. Knox*, 839 F.2d 285, 289 (6th Cir.1989) (quoting *Miranda v. Arizona*, 384 U.S. 436, 477, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)). Despite this standard, we have upheld investigative stops effectuated with the display or use of firearms where the officers making the stops possessed a justifiable fear of personal safety. *See United States v. Hardnett*, 804 F.2d 353, 356 (6th Cir.1986). Additionally, officers may block a suspect's vehicle during an investigative stop because of the chance that the suspect could flee. *See id.* at 357.

While officers may detain suspects at gunpoint and may take steps to prevent the flight of suspects in a vehicle within the bounds of a permissible *Terry* stop, they cross the line from investigative stop to arrest when the detention becomes "in

important respects, indistinguishable from a traditional arrest." *Dunaway*, 442 U.S. at 212, 99 S.Ct. 2248. Therefore, while the giving of a *Miranda* warning does not automatically convert a *Terry* stop into an arrest, it serves as evidence that a trained officer believed he was taking a suspect into custody and thus was required to give a warning. *See Obasa*, 15 F.3d at 607. Moreover, this Court has recognized that officers cross the line into an arrest when they place a suspect in a police vehicle for questioning, noting in one case that:

> When the agents placed Richardson in the back of the police car, they went beyond the bounds of *Terry*. Placing Richardson in the police cruiser not only constituted a seizure, as mentioned earlier, but also crossed the line into arrest. Richardson was moved from his car to another location, and his freedom of movement was severely restricted.

*United States v. Richardson*, 949 F.2d 851, 857 (6th Cir.1991).

Plaintiffs were undeniably arrested during the detention at issue in this case. Assuming the officers had reasonable suspicion to detain Plaintiffs' vehicle on the grounds that they believed the occupants of the vehicle had shot a security guard at Chuck's, the officers had reason to fear for their safety and may have been justified in detaining Plaintiffs at gunpoint. However, the officers were entitled to detain Plaintiffs only for a brief investigation into the circumstances giving rise to their stop. Instead, the officers in this case handcuffed Plaintiffs, immediately seated them in police cruisers, read them their *Miranda* rights, and then interrogated them. It seems clear that at this point Plaintiffs did not feel free to leave. Moreover, when the officers handcuffed Plaintiffs, forcibly moved them from one location to another, and performed acts typically performed by officers taking suspects into custody, the detention of Plaintiffs bore the traditional indicia of a formal arrest and could no longer fairly be deemed a mere *Terry* stop. Indeed, short of a trip to the stationhouse

itself, it is difficult to imagine police action that could seem less like a formal arrest.

The majority strings together a number of cases to assert that these actions did not necessarily lead to a de facto arrest of Plaintiffs. I find the Court's reasoning, and the authority upon which it relies, unpersuasive. Specifically, the cases which the majority cites support the possibility that each intrusive action, if taken alone or considered in isolation, could not amount to arrest. For example, while this Court found no arrest in *United States v. Critton*, 43 F.3d 1089, 1094 (6th Cir.1995), where officers patted a suspect down and placed him in a police cruiser, the officers in that case did not handcuff the suspect at gunpoint, did not interrogate the suspect, and did not read the suspect his *Miranda* rights until they formally arrested him. *See id.* at 1092–93. Similarly, while the majority cites a pair of unpublished opinions for the proposition that handcuffing does not automatically transform a detention into an arrest, the officers in those cases did not place their suspects in police cruisers, interrogate them, or read them their *Miranda* rights at the same time. *See United States v. Monhollen*, No. 97–5855, 1998 WL 152934, at *2 (6th Cir. Mar.24, 1998) (table); *United States v. Walker*, No. 94–3521, 1995 WL 141343, at *1 (6th Cir. Mar.31, 1995) (table). In every one of these cases, the officers developed probable cause for arrest during detention, and placed the criminal suspects under formal arrest soon after handcuffing or placing them in patrol cars. *See Critton*, 43 F.3d at 1094; *Monhollen*, 1998 WL 152934, at *2; *Walker*, 1995 WL 141343, at *1. However, not one of them addresses the combination of actions taken by the police in the present matter. Collectively, the actions of the officers in this case constituted a "clear deprivation of liberty caused by law enforcement officials" such that a "reasonable person would have believed he was not free to leave." *United States v. Hatfield*, 815 F.2d 1068, 1070–71 (6th Cir.1987).

While the majority finds the police action in using handcuffs and detaining Plaintiffs in police cruisers "reasonably necessary to protect the officers' safety during the investigation," I find no support, and they offer none, for this proposition. Indeed, we have authorized officers to undertake highly intrusive behavior, such as frisks for weapons and the display of arms, as reasonably necessary precautions for their own protection when they believe the suspect with which they are dealing is armed and dangerous. *See Hardnett*, 804 F.2d at 356–57 (noting that even a show of firearms is highly intrusive and may in some circumstances amount to arrest). In the present case, while the officers ostensibly had reason to believe that Plaintiffs were armed and dangerous,[4] they went far beyond a mere show of force and the taking of steps to secure the area. Surely, the officers ensured their own safety by ordering Plaintiffs out of the car and to lie face down on the ground at gunpoint, handcuffing Plaintiffs, and then patting Plaintiffs down for weapons. Nevertheless, the officers in this case took the extra steps of moving Plaintiffs to police cruisers, reading *Miranda* rights, and then interrogating them about the events at Chuck's. It is doubtful that these additional steps were necessary to further secure the officers' safety, and it is difficult to understand how, at that point, fear re-

---

4. I believe there is some conflict in the testimony on this point. While the majority states that the officers mistook the sound of a breaking bottle for that of gunfire, Deputy Schutte admitted that he "was debating that … I thought it did [sound like gunfire] but then I thought no, it wouldn't be, it would be louder.... I'm not going to sit there and swear that it was a gunshot but I wasn't going to swear that nothing happened either." (Schutte Dep. at 48.) Indeed, as soon as Deputy Schutte arrived at the location of the assault, he realized that there were no shell casings but there was a broken beer bottle on the street by the victim. Despite his doubts, Deputy Schutte radioed Deputy Hopper that someone had been shot, and consequently none of the other officers learned that the victim was not shot until well into the detention of Plaintiffs.

quiring further intrusiveness could be characterized as reasonable. *Cf. Crisp v. City of Kenton*, No. 97–3192, 1998 WL 180561, at *4 (6th Cir. Apr.8, 1998) (table) (observing that once officers completed a perimeter search and no longer had reason to fear their safety, failure to release suspects from handcuffs turned an investigatory stop into an arrest requiring probable cause). The law of *Terry* stops surely does not permit one to meet the probable cause requirement for arrest by claiming no more than a need for officer safety. *See Dunaway*, 442 U.S. at 210, 99 S.Ct. 2248 (noting that the scope of *Terry* must remain narrow because it is an exception to the general rule requiring probable cause).

Finally, I take issue with the treatment by the majority of the issue of the length of the detention in this case. It is true that there can be no bright line rule as to how long a *Terry* stop may last before becoming an arrest. *See Sharpe*, 470 U.S. at 685, 105 S.Ct. 1568. Rather, what is important is "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain defendant." *Id.* at 686, 105 S.Ct. 1568. This principle means, among other things, that even if a detention is not excessive in length, it may become an arrest if "at some point in the investigative process, police procedures can qualitatively and quantitatively be[come] so intrusive with respect to a suspect's freedom of movement and privacy interests as to trigger the full protection of the Fourth and Fourteenth Amendments." *Hayes v. Florida*, 470 U.S. 811, 815–16, 105 S.Ct. 1643, 84 L.Ed.2d 705 (1985). Together, these standards require officers to act immediately to confirm or dispel their suspicions before they act to step up the intrusiveness and force of a detention so that it becomes an arrest.

In this case, while the majority explains that it is not surprising that the investigatory steps taken by the police in this instance would take thirty-five minutes, the law requires this Court to ask whether the police acted diligently to confirm or deny their suspicions about Plaintiffs before arresting them. Once the officers had stopped Plaintiffs, assured themselves that Plaintiffs were not carrying any weapons, and generally secured the area by ordering Plaintiffs to the ground, they should have then immediately asked questions to confirm or deny their suspicions, or they should have radioed Deputy Schutte or Trooper Dickens for more information to use in doing so. Instead, they proceeded to take further intrusive measures—such as handcuffing, transporting Plaintiffs to police vehicles, and reading *Miranda* rights—before proceeding with their investigation and before contacting Deputy Schutte for more information. Indeed, the officers investigating the scene at Chuck's quickly learned that no shots had been fired and that no officer had been hit.

This analysis is not "unrealistic second-guessing" or "post-hoc evaluation." *Sharpe*, 470 U.S. at 686–87, 105 S.Ct. 1568. Rather, this reasoning only invites officers to act as the Constitution would have them act. Indeed, the Fourth Amendment does not authorize officers to first take steps approaching formal arrest merely on the basis of reasonable suspicion, and to then conduct an investigation. *See Brown v. Illinois*, 422 U.S. 590, 605, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975) (disapproving arrests made for "investigatory" purposes). Rather, as courts have interpreted it, the Fourth Amendment requires officers making a stop on the basis of reasonable suspicion to first investigate to confirm or dismiss that suspicion before intensifying the intrusiveness of their actions and before carrying out an informal arrest. In my view, the failure of the officers to diligently follow this order of action resulted in the unconstitutional arrest of Plaintiffs without probable cause.

### III.

In its application of the law to the facts, this Court focuses on the subjective per-

spective of the officers involved to the exclusion of objective inferences that favor Plaintiffs' case. Indeed, this Court places emphasis on the difficulties facing the officers but fails to answer whether a reasonable officer would have identified one vehicle of many departing a chaotic scene as the getaway car, would have thereafter gathered as little information about the vehicle as did Deputy Schutte, or would have believed that he could identify the vehicle for another officer even after he lost sight of it. Similarly, the majority does not answer whether a reasonable officer would have relied on a car count without any knowledge of the method his partner used to count cars. Finally, the majority fails to answer whether a reasonable officer would reasonably have believed that handcuffing suspects, placing them in the back of a police cruiser and reading *Miranda* rights prior to investigating the circumstances giving rise to suspicion fell within the lawful scope of a *Terry* stop.

Instead, the Court supports its conclusion by assigning great weight to those facts most favorable to Defendants, and by minimizing those facts tending to show that the conduct of the officers in this case was unreasonable. Moreover, the majority rests its case on the notion that on the facts it has identified, the officers' actions could potentially be reasonable under Fourth Amendment legal standards, and overlooks the fact that reasonable jurors could disagree as to whether such police action actually was reasonable, even under difficult circumstances. By resolving the case in this fashion, the majority contravenes fundamental principles of summary judgment procedure by weighing evidence and performing factfinding that should have been reserved to a jury.

Because reasonable minds could differ on the issues of whether reasonable, articulable suspicion existed to stop the particular vehicle in question, whether Deputy Hopper objectively relied on the radio bulletin issued by Deputy Schutte, and wheth-

er the officers diligently pursued a brief investigation designed to confirm or dispel the suspicion that Plaintiffs attempted a homicide at Chuck's, I believe disposition of this case on summary judgment was inappropriate. Nor could qualified immunity justify the dismissal of Plaintiffs' case, for even if the officers who may have violated Plaintiffs' clearly established Fourth Amendment rights acted with good intentions, subjective good faith cannot provide a shield for behavior that does not stem from objective legal reasonableness. *See Cope v. Heltsley*, 128 F.3d 452, 458–59 (6th Cir.1997).

Moreover, the result reached by the majority reflects a departure from the basic principles of the Fourth Amendment. *Cf. United States v. Place*, 462 U.S. 696, 721, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983) (Blackmun, J., concurring) (expressing dismay at the "emerging tendency on the part of the Court to convert the *Terry* decision into a general statement that the Fourth Amendment requires only that any seizure be reasonable"). Indeed, the Court cautioned in *Terry* that "simple 'good faith on the part of the arresting officer is not enough.... If subjective good faith alone were the test, the protections of the Fourth Amendment would evaporate, and the people would be secure in their persons, houses, papers and effects, only in the discretion of the police.'" 392 U.S. at 26, 88 S.Ct. 1868 (quoting *Beck v. Ohio*, 379 U.S. 89, 97, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964) (internal quotation marks omitted)). Moreover, while police officers must have the authority to detain suspicious individuals briefly and, for safety purposes, to conduct a reasonable search for weapons, such protective measures are to be "brief, though far from inconsiderable, intrusion[s] upon the sanctity of the person," whereas "[a]n arrest is a wholly different kind of intrusion upon individual freedom." *Terry*, 392 U.S. at 26, 88 S.Ct. 1868. These principles must be read together with the rule that courts cannot simply "adopt a multifactor balanc-

ing test of 'reasonable police conduct under the circumstances' to cover all seizures that do not amount to technical arrests," because judicial scrutiny is limited to the intrusions narrowly defined by *Terry* and its progeny. *Dunaway,* 442 U.S. at 213, 99 S.Ct. 2248. As the Fourth Amendment required more of the officers who unreasonably detained and improperly arrested Plaintiffs in this case, I respectfully dissent.