*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 07a0119p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

RAYMOND E. HUMPHREY,

> *Plaintiff-Appellee,*

      *v.*

> No. 05-4462

DUANE M. MABRY; KEVIN GEORGE; and KEVIN
WHEELER,

> *Defendants-Appellants.*

---

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 04-00312—Gregory L. Frost, District Judge.

Argued: September 19, 2006

Decided and Filed: April 2, 2007

Before: CLAY and GILMAN, Circuit Judges; OBERDORFER, District Judge.[*]

---

## COUNSEL

**ARGUED:** David E. Peterson, COLUMBUS CITY ATTORNEY'S OFFICE, Columbus, Ohio, for
Appellants. James D. McNamara, Columbus, Ohio, for Appellee. **ON BRIEF:** David E. Peterson,
COLUMBUS CITY ATTORNEY'S OFFICE, Columbus, Ohio, for Appellants. James D.
McNamara, Columbus, Ohio, for Appellee.

      OBERDORFER, D. J., delivered the opinion of the court, in which GILMAN, J., joined.
CLAY, J. (pp. 11-19), delivered a separate dissenting opinion.

---

## OPINION

---

      OBERDORFER, District Judge. This civil rights action, brought under 42 U.S.C. § 1983,
arises out of a traffic stop, forcible seizure at gun point, search and brief restraint of the plaintiff,
who was driving a car mistakenly identified by Columbus, Ohio police officers as a wanted car
driven by a dangerous, gun-bearing suspect. The plaintiff's complaint alleges that three Columbus
police officers and the City of Columbus are liable for violating his constitutional rights, specifically

---

[*] The Honorable Louis F. Oberdorfer, United States District Judge for the District of Columbia, sitting by
designation.

the Fourth Amendment's prohibition against unreasonable seizures and the use of excessive force. We conclude that Humphrey's complaint sufficiently alleges, and a reasonable jury could find, that Columbus police officers did violate his Fourth Amendment rights. But we also conclude that, because a reasonable officer in the shoes of the individual officer defendants, in the particular circumstances here, could have reasonably believed that his actions were constitutional, we **REVERSE** the denial of qualified immunity for the three individual officer defendants and **REMAND** for further proceedings consistent with this opinion.

## I. BACKGROUND

### A.    Factual Background

Viewing the facts in the light most favorable to the plaintiff, the record establishes the following:

### 1.        The Seizure

On the evening of December 10, 2002, Raymond Humphrey, was driving his bright blue PT Cruiser on Parsons Avenue in Columbus, Ohio. On his way home from work as the Director of Blackburn Recreation Center, a center for inner-city children, he stopped at a Kroger's grocery store. A few minutes past 10:30 p.m., he left the Kroger's and turned south onto Parsons Avenue. After driving a few blocks, he came upon a police roadblock. Officers Dwayne Mabry and Kevin George had stopped traffic and were waving each car through one at a time. Unbeknownst to Humphrey, the two officers had been alerted by an officer in a helicopter, Officer Kevin Wheeler, that he had in sight a PT cruiser heading their direction being driven by a suspect with a gun.

At approximately 10:35 p.m., Humphrey stopped his PT Cruiser in the line. To his surprise, Officers Mabry and George approached, drew their guns, pointed them at the car and yelled at Humphrey to get out. As he began to do as he was ordered, with Officer George acting as cover, Officer Mabry holstered his gun. Officer Mabry then grabbed Humphrey roughly by the wrist, held on to him firmly while pulling him the rest of the way out of the car, and "patted him down." As the officers started to handcuff Humphrey, he alerted them that he had an injured thumb. He was not resisting, and the officers left the injured hand uncuffed. Officer George holstered his gun and briefly shined his flashlight through the windows to search for a gun in the car. Within less than five minutes, Officers Mabry and George discovered that Humphrey was not a suspect. They released him forthwith.

### 2.        The Preceding Events

Earlier that same evening, at approximately 9:52 p.m., Volanda Graham had called 911 from her home at 795 Thurman Avenue in the Eleventh Police Precinct in Columbus. She reported to the 911 dispatcher that her sister's ex-boyfriend, Greg Dunson, "just tried to pull a gun out and shoot my dad." (JA 173). She described Dunson as "male black," very tall (about 6'3"), with glasses, curly hair, and wearing a black jersey with white letters and red writing, and black jeans. (JA 173, 176). Graham also reported that Dunson had a silver Chrysler and was with a friend named "Lucas." Graham described Lucas as light-skinned, 5'8" or 5'9" and wearing a toboggan-type hat. According to Graham, Dunson, still carrying the gun, had left her house on foot.

In response to Graham's 9:52 p.m. call, at 9:53 p.m. the police dispatcher immediately directed three police cruisers to Graham's house for a "33 run" (an incident with a gun). The dispatcher stated that a "male black, 6'3" in a grey Chrysler, CFT2945, has a 33 [gun] out and is threatening caller's father." (JA 178). The dispatcher then aired that the suspect, named Greg Dunson, had left his car at the Graham house and "just now took off walking down the street." (JA 178). The dispatcher also alerted the officer in a helicopter then in the air to be on the lookout for

Dunson, who she further described as wearing a "black jersey with red lettering" and "wearing glasses and . . . black jeans." (JA 116, 178).

Between the dispatcher's initial broadcast and the mistaken stop of Humphrey at 10:35 p.m., officers searching for the suspect at and in the vicinity of the Graham house, officers in nearby police cars, officers in a police helicopter, and the dispatcher transmitted, via a police radio channel, what information they thought they had about where to locate Dunson, his friend, his car (whether Dunson or his friend was driving it) and, particularly, the gun as follows:

- *9:56 p.m.*:  The dispatcher aired that Dunson was "supposed to be with another male black, light skinned, name of Lucas." (JA 117, JA 179).

- *9:58 p.m.*:  An officer who had arrived at the Graham house to investigate, Officer [first name] Smith, aired that Dunson "left westbound on Thurman," that he left "in his vehicle," and that the vehicle was "going to be a grey . . . PT Cruiser." (JA 117, 179).

- *9:59 p.m.*:  Officer Wheeler began his shift in the helicopter. The first he heard of the incident at the Graham house was a request from the dispatcher that he check "the area of 795 Thurman" because there was a car "headed westbound about 5 minutes ago on a 33 run, male black in a grey PT cruiser." (JA 117, 180).

- *9:59 p.m.*:  Officer Smith reported from the vicinity of the Graham home that "the vehicle left eastbound with one of [the suspect's] friends driving it and our suspect left westbound" . . . "they're also saying that the suspect threw the 33 into the PT Cruiser before he went walking westbound and the car went eastbound." (JA 117, 180).

- *10:02 p.m.*:  Another officer at the scene of the incident, Officer Russell, told Officer Wheeler, now in the helicopter, "that car PT Cruiser, grey in color, went eastbound from this location 5 minutes, possibly 10 minutes old now, that's the one that has the 33 in it." (JA 181).

- *10:03 p.m.*:  The dispatcher reported that the license plate number originally given from the scene, CFT2945, came back to a 1996 GMC truck out of Toledo, Ohio, registered to a Ruth Smith, indicating that the tag number reported by Graham was incorrect. (JA 117-18).

- *10:21 p.m.*:  Officer Smith reported to the dispatcher that the full name of Dunson's friend is Lucas Downs and that it is Downs who is driving the suspect's vehicle. He added: "supposedly once again the 33 was seen and supposedly was put back in the vehicle before the vehicle left." (JA 185).

There was a brief lull in radio activity on this search from 10:21 p.m. until 10:33 p.m., while other incidents (including another gun incident) were reported and responded to. Then things started to happen very quickly in the search for Dunson. Within five minutes, the entire incident with plaintiff Humphrey began and ended.

- *10:33 p.m.*: Officer Smith aired, without indicating the source of his information: "our suspect out of our 33 run was just seen in the PT Cruiser westbound on Frebis from Ohio." (JA 190).[1]

- *10:34 p.m.*: Another nearby officer, Officer Wilson, responded that he would head eastbound on Frebis, from Parsons, to look for the vehicle. (JA 118, 190).

- *10:34 p.m.*: Officer Russell, without indicating the source of his information, told Officer Wheeler (still in the helicopter) to look for the PT Cruiser on Parsons Avenue, and added: "you may want to check for that PT Cruiser anywhere from Frebis/Parsons, all the way to Livingston and Parsons." (JA 190).

- *10:34 p.m.*: Officer Wheeler responded immediately: "We got a PT Cruiser dark grey, southbound from the Kroger here on Parsons, that's probably it."

- *10:34 p.m.*: Officer Russell added: "Be advised there is a 33 on board, either in the glove box or under the passenger seat."

- *10:34 p.m.*: Officer Wheeler reported that the PT Cruiser he was watching was "still southbound on Parsons, right in front of Parsons market" and that it "is going to be the third one in line." (JA 190).

### 3.     Realizing the Mistake

Officers Mabry and George were the first officers near Parsons market at 10:35 p.m. They were on bicycles patrolling the thirteenth police precinct. They had heard portions of the earlier broadcasts pertaining to the incident at Graham's house in the eleventh precinct, but they attested that they had been focused primarily on communications affecting their precinct. (JA 66, 71). However, hearing the transmission from Officer Wheeler in the helicopter and realizing that they happened to be less than a block away, they set up a road block on the route that Humphrey, the driver of the PT cruiser, was following.

At approximately 10:35 p.m., Officers Mabry and George conducted the stop without yet knowing Humphrey's name. At that time, a back-up officer in a cruiser arrived on the scene and radioed to the dispatcher Humphrey's license place number, AUN1NX. The officer asked what tag number had been reported. The dispatcher responded that the reported license plate number was CFT2945; Officer Smith immediately aired: "the tag from the original run was bad." (JA 191). The dispatcher then ran the new tag number, which identified the car stopped as belonging to Humphrey.

Another back-up officer immediately requested the full description of the suspect and/or his friend. (JA 191). An officer who was still investigating near the Graham house responded by radio with a description of Dunson, stating that he was "wearing a Cincinnati Reds shirt, black jacket, has wire-rimmed glasses, short curly hair, goatee, lite complected, about 6'1" 215, age 19, his name is Gregory Dunson." (JA 191). The officer near the Graham house did not mention or provide a description of Downs.

The person stopped by Officers Mabry and George was obviously not Dunson, but a much older (52), much shorter (5' 6" tall), much lighter (weighing only about 160 pounds), darker-

---

[1] The transmission record does not indicate the source of this information, but Officer Smith filed an affidavit stating that he thought it was accurate information given to him by people in the area.

complexioned African-American male, with a much different hairstyle (graying beard, neatly cut short hair) and wearing different clothes (work clothes with a visible City of Columbus ID badge around his neck). Hearing the description of Dunson, and focusing on Humphrey, Officers Mabry and George immediately terminated their questioning and detention of Humphrey. At 10:37 p.m., an officer in one of the cruisers aired that the stop was a "Code 4," meaning that it was not the suspect. The exact length of the detention is not clear, but, according to Humphrey, it was no longer than five minutes. (JA 50). Officer Mabry apologized for their mistake and attempted to explain the confusion to Humphrey.

About 20 minutes later, other police officers stopped a PT Cruiser, license number CF*P*2945, at 747 Mithoff Avenue, approximately three-quarters of a mile from the Kroger parking lot on Parsons Avenue. (JA 75, 119). They recovered a gun from the vehicle, and later identified Downs as the driver. Soon thereafter, police apprehended Dunson on foot. (JA 120, 200).

**B.      Procedural Background**

On April 23, 2004, Humphrey brought this action under 42 U.S.C. § 1983 in the United States District Court for the Southern District of Ohio against Officers Mabry and George, the City of Columbus, and six Joe Doe Officers. The complaint alleged that the defendants had violated the plaintiff's Fourth Amendment rights by subjecting him to an unlawful seizure and an excessive use of force. On September 27, 2004, Humphrey amended his complaint to include Officer Wheeler as a defendant, to add a claim for conspiracy against all of the defendants, and to add claims against the City of Columbus for failure to train, supervise, and discipline police officers and for ratification of improper police conduct.

In May 2005, Humphrey moved for partial summary judgment against Officers Mabry, George and Wheeler on his unlawful seizure claim. The defendants cross-moved for summary judgment on the merits on all of Humphrey's claims and/or that the individual defendants were entitled to qualified immunity on the unlawful seizure and excessive force claims.

On October 21, 2005, the district court granted the plaintiff's motions for partial summary judgment, ruling that Humphrey was unlawfully seized, denied the individual defendants qualified immunity on both the unlawful seizure and excessive force claims, and granted the remainder of the defendants' motion for summary judgment. The defendant officers timely filed this interlocutory appeal of the district court's denial of qualified immunity. This being an interlocutory appeal from only the district court's rejection of the individual officers' qualified immunity defense, none of the other elements of the district court's summary judgment order are directly before us.

## II. DISCUSSION

The two main issues presented on appeal are: (1) whether this court has jurisdiction; and (2) whether the district court erred in denying qualified immunity for the officers.

**A.      Jurisdiction**

"[A] district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291 notwithstanding the absence of a final judgment." *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985); *see also Turner v. Scott*, 119 F.3d 425, 427 (6th Cir. 1997). Even if there are factual disputes in the underlying case, the denial of qualified immunity may be interlocutorily appealed as long as the defendant is "prepared to overlook any factual dispute and to concede [for purposes of the appeal] an interpretation of the facts in the light most favorable to the plaintiff's case." *Berryman v. Rieger*, 150 F.3d 561, 562 (6th Cir. 1998). The plaintiff argues that the defendants' arguments on appeal do not accept the version of the facts most favorable to him and, therefore, whether the district court

erred in denying qualified immunity does not turn on "neat abstract issues of law." *Id*. at 563 (quoting *Johnson v. Jones*, 515 U.S. 304, 317 (1995)). However, the district court found no material facts in dispute, the parties have not identified any here, and we do not find any in the record. Accordingly, the issues in this appeal are purely legal, and we have jurisdiction.

## B.     Qualified Immunity

The defense of qualified immunity shields government officials from "liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see also Smoak v. Hall*, 460 F.3d 768, 777 (6th Cir. 2006). Once defendants satisfy their initial burden of demonstrating that they were acting within the scope of their authority, a plaintiff bears the burden of proving that defendants are not entitled to qualified immunity. *See Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006); *see also Wegener v. City of Covington*, 933 F.2d 390, 392 (6th Cir. 1991).

In determining whether a law enforcement officer is entitled to qualified immunity, a court must consider two sequential questions: (1) "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?"; and (2) "whether the right was clearly established." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The issue of qualified immunity may be submitted to a jury only if "the legal question of immunity is completely dependent upon which view of the [disputed] facts is accepted by the jury." *Brandenburg v. Cureton*, 882 F.2d 211, 216 (6th Cir. 1989). We review *de novo* the district court's denial of qualified immunity. *See Feathers v. Aey*, 319 F.3d 843, 847 (6th Cir. 2003) (citations omitted); *Yates v. City of Cleveland*, 941 F.2d 444, 446 (6th Cir. 1991).

### 1.     Would the Facts Alleged Establish a Violation of Plaintiff's Constitutional Rights?

We conclude that Humphrey has indeed alleged that the officers violated his constitutional rights guaranteed by the Fourth Amendment. As a threshold matter, a search and seizure without a warrant by police officers is presumptively unreasonable, although several exceptions apply. An officer may permissibly conduct an investigatory stop when he or she can point to "a particularized and objective basis" that "leads . . . reasonably to [the conclusion] in light of [the officer's] experience that criminal activity may be afoot and that the persons with whom [the officer] is dealing may be armed and presently dangerous." *Terry v. Ohio*, 392 U.S. 1, 30 (1968); *Houston v. Clark County Sheriff Deputy John Does 1-5*, 174 F.3d 809, 813 (6th Cir. 1999). Reasonable suspicion for an investigative stop must be considered under the totality of the circumstances, considering "all of the information available to law enforcement officials at the time." *Feathers*, 319 F.3d at 849.

Whether excessive force was used in conducting an investigative stop is also subject to a Fourth Amendment reasonableness inquiry. *Graham v. Connor*, 490 U.S. 386, 395 (1989). This inquiry "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id*. at 396 (internal quotation marks omitted). Reasonableness must be judged "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id*.; *Pray v. City of Sandusky*, 49 F.3d 1154, 1158 n.3 (6th Cir. 1995). Even if a stop at gunpoint is reasonable, the use of force to effect a seizure after officers knew or should have known that they had the wrong person is inherently unreasonable. *Pray*, 49 F.3d at 1161.

We agree with our dissenting colleague that, viewing the facts in the light most favorable to Humphrey, he has alleged a constitutional violation; that is, considering "all of the information available to law enforcement officials at the time," *Feathers*, 319 F.3d at 849, a reasonable jury could

conclude that the Columbus police violated Humphrey's Fourth Amendment rights when they misidentified his car, stopped him at gunpoint, forcibly seized him and restrained him, albeit briefly. Accordingly, we move to the second prong of the qualified immunity analysis.

## 2.        Were the rights "clearly established"?

A right is "clearly established" for qualified immunity purposes if "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202; *see also Smoak*, 460 F.3d at 778; *Feathers*, 319 F.3d at 848.[2]   This inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier*, 533 U.S. at 201. If *no* reasonably competent officer would have taken the same action, then qualified immunity should be denied; however, "if officers of reasonable competence could disagree on [the legality of the action], immunity should be recognized." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). As the Supreme Court has explained, "[t]he concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct." *Saucier*, 533 U.S. at 205. Qualified immunity leaves government authorities "ample room for mistaken judgments." *Scott v. Clay County*, 205 F.3d 867, 873 n.9 (6th Cir. 2000) (citations omitted). The doctrine protects "all but the plainly incompetent or those who knowingly violate the law." *Malley*, 475 U.S. at 341.

In a situation such as the present one where the constitutional violations are based on the *collective* knowledge of a number of police officers, it is important to recognize that an individual officer is still entitled to qualified immunity if an objectively reasonable officer in the same position could have reasonably believed that he or she was acting lawfully. *See, e.g., Saucier*, 533 U.S. at 202. More specifically, where individual police officers, acting in good faith and in reliance on the reports of other officers, have a sufficient factual basis for believing that they are in compliance with the law, qualified immunity is warranted, notwithstanding the fact that an action may be illegal when viewed under the totality of the circumstances. *See Feathers,* 319 F.3d at 851; *Smoak*, 460 F.3d at 782.

This Court has confronted on several occasions the question of when, for qualified immunity purposes, an officer is entitled to rely on communications from other officers. In *Feathers*, for example, police officers entered the wrong building and seized a suspect based on a dispatcher's inaccurate report. The court in *Feathers* ruled that the officers were entitled to qualified immunity because the information they had at the time gave "the *individual defendants* . . . a sufficient factual basis for thinking that they were acting consistently with *Terry*." 319 F.3d at 851 (emphasis added). Similarly, in *Smoak*, radio dispatches had instructed the defendant police officers to "be on the lookout" for suspects involved in a "possible robbery." The Smoak family vehicle was improperly identified as suspicious after a citizen driver reported that it was traveling at a high speed and that money was flying out of the vehicle – it turned out that James Smoak had left his wallet on the roof after purchasing gasoline. During the stop, the officers pointed their guns at the family members' heads, shot and killed their dog, and caused injury to James Smoak's knee. *Smoak,* 460 F.3d at 773-75. This court concluded that the stop was constitutional, but that the seizure was an unconstitutional arrest without probable cause. Nonetheless, the court in *Smoak* found that the officers had a "good-faith defense" relating to the felony stop and the use of guns: "This conduct, . . . which in hindsight must be viewed as an unreasonable seizure under the totality of the circumstances, was not

---

[2] The *Feathers* decision actually articulates a three-prong test, but as this court did in *Smoak*, we apply the two-prong test from *Saucier*. The distinction is not material. *See, e.g., Sample v. Bailey,* 409 F.3d 689, 696 n.3 (6th Cir. 2005).

so clear to the [law enforcement officers] on the scene as to deny them qualified immunity on this basis." *Id.* at 782.[3]

Accordingly, in a case such as this where one officer's claim to qualified immunity from the consequences of a constitutional violation rests on his asserted good faith reliance on the report of other officers, we consider: (1) what information was clear or should have been clear to the individual officer at the time of the incident; and (2) what information that officer was reasonably entitled to rely on in deciding how to act, based on an objective reading of the information. *See id.; see also United States v. Hensley*, 469 U.S. 221, 232-33 (1985).

### a.          Officers Mabry and George

### (1)  Unreasonable Search and Seizure

To reiterate:  At approximately 10:34 p.m., Officers Mabry and George received information from Officer Wheeler, who was in a helicopter, that a PT Cruiser with a gun on board was headed in their direction and was wanted in connection with an investigation into a threat to use that gun. They observed that the helicopter was following the PT Cruiser.  It was dark outside.  When they saw what they thought was the PT Cruiser, Mabry and George walked into the street and stopped a line of traffic.  The PT Cruiser was at the end of the line.  They drew their guns and approached it on foot. They both testified that when they made the stop, they were relying on the immediate radio communications alerting them that a PT Cruiser was nearby with a gun and gunman aboard and identifying the specific (albeit blue) PT Cruiser that was "probably it."

In retrospect, it is clear that during the half hour that elapsed between the 911 call and the stop of Humphrey, the officers searching for the suspect at and in the vicinity of the Graham house and the dispatcher all broadcast conflicting information.  There was confusion over whether Dunson was on foot or in his car; whether, if he was on foot, he had thrown the gun into the car before taking off; whether the PT Cruiser, once it left Graham's house, was headed eastbound or westbound; what its license number was; and whether the driver of the car was Dunson or his friend, Lucas.  However, as the Supreme Court explained in *Hensley*, "effective law enforcement cannot be conducted unless police officers can act on directions and information transmitted by one officer to another and that officers, who must often act swiftly, cannot be expected to cross-examine their fellow officers about the foundation for the transmitted information." 469 U.S. at 231 (quotation omitted).

The dissent concludes that Officers Mabry and George should have sought further confirmation that this was *the* PT Cruiser Wheeler wanted stopped, and before stopping it, should have checked the license tag or requested a physical description of the suspect.  We find that Officer Wheeler's detailed (albeit erroneous) identification of the car was sufficient for Mabry and George to decide quickly to stop the reportedly gun-bearing PT Cruiser pointed out from the helicopter.  A reasonable officer could have concluded that a suspect driving away from the scene of a crime where a gun was brandished creates a circumstance that is as exigent as a police confrontation with an armed robbery suspect. *Compare Smoak*, 460 F.3d at 774-75.  We also note that during the stop, the officers covering in other cruisers checked to see if the tag number of Humphrey's car corresponded to the tag number originally reported, to be told only that it was not a "good" number, without reporting what the original number was.

---

[3] In the *Smoak* case, the Court further found that sufficient issues of fact remained as to the reasonableness of the use of force against James Smoak to deny qualified immunity.  It also indicated that it would have been concerned about granting qualified immunity to the shooter of the dog, but it did not address that issue because of a stipulation of dismissal as to that officer. *Id.* at 783-4.

Similarly, it is possible to fault Officers Mabry and George for seizing a bright blue PT Cruiser, despite Officer Wheeler's contemporaneous report that the PT Cruiser in question was dark grey. However, this is all hindsight. The reasonableness of the conduct of the officers is enhanced by Officer Wheeler's specific identification of Humphrey's PT Cruiser as "probably it," and their belief that the driver was armed. Under these circumstances, a reasonable officer could have made the same mistake, and as a result, could have reasonably believed the stop was lawful. Accordingly, Officers Mabry and George are entitled to qualified immunity on the unlawful seizure claim.

### (2) Excessive Force

The use of force during a *Terry* stop must be reasonable "based upon the facts known to the officers [on the scene] at the time of the stop." *Houston*, 174 F.3d at 815. Furthermore, this court has specifically approved the use of guns and handcuffs during an investigatory stop. *Id.*; *see also Smoak*, 460 F.3d at 782. In conducting the stop, Officers Mabry and George forcibly removed Humphrey from his vehicle at gunpoint, conducted a pat-down, and partially handcuffed him. The report that this was a "33 run" entitled these officers to believe reasonably that the suspect for whom they were looking in the PT Cruiser was armed. When Humphrey did not resist, the officers holstered their guns. Humphrey concedes that the officers did not harm him, and in fact were careful not to aggravate a "pre-existing injury" to his thumb.

Our dissenting colleague suggests that the circumstances here were not exigent, and that the officers should have waited to approach the vehicle and forcibly secure the driver until they obtained more information to help them identify the correct suspect. However, they had authoritative information that the suspect whom they believed they were apprehending was armed with a gun with which he had made a threat – a time-sensitive situation requiring a prompt reaction. It was not necessarily clear to them that they had the wrong man at the moment they made the decision to use force.

Officers Mabry and George recalled, from "bits and pieces" of the initial radio reports describing the incident while they were on patrol in another precinct, that at the time they made the stop, the suspect for whom they were looking was a black male. However, Officers Mabry and George testified that in this fast-moving night-time scenario, they were focused on the information most immediately transmitted to them – that there was a dangerous man with a gun in the PT Cruiser which they had stopped. Officers on foot confronting a suspect seated behind the wheel of a car could reasonably believe that they faced serious peril to life and limb. They could reasonably believe that it was lawful for them, as speedily as possible, to point their guns at that suspect, quickly and forcibly remove him from his car, and restrain him thereafter, without stopping the process to obtain a fuller description. In any event, as soon as they obtained a detailed physical description of the suspect and realized that Humphrey did not match that description, they let him go.

Officers Mabry and George could have reasonably believed that they were acting lawfully under the circumstances. Accordingly, Officers Mabry and George are entitled to qualified immunity on the excessive force claim.

### b.      Officer Wheeler

Officer Wheeler's entitlement to qualified immunity depends on a different set of considerations. For him, the issue is whether an officer in his situation could have reasonably believed that directing officers on the ground to stop Humphrey's PT cruiser was lawful.[4]

---

[4] Officer Wheeler did not participate in the use of force against Humphrey; therefore, the excessive force claim is not relevant to him.

Officer Wheeler began his helicopter shift just before 10 p.m.; he did not hear the initial reports that described the suspect and indicated that he had left the site of the 911 call on foot. What Officer Wheeler did know was that he was looking for a dark-grey PT Cruiser "anywhere from Frebis/Parsons, all the way to Livingston and Parsons" on a "33-run." He also heard the reports that the suspect's friend was driving the PT Cruiser and that the gun was in the car. Officer Wheeler testified that from his vantage point, Humphrey's blue PT Cruiser looked dark-grey. Finally, Officer Wheeler spotted Humphrey's PT cruiser close to the scene of the original crime and in the limited geographic area where he had just been instructed to look.

In retrospect, Officer Wheeler's identification of Humphrey's PT cruiser as "probably it" was perhaps unreasonable. He was acting on fairly limited information in concluding, from 300-500 feet in the air, that Humphrey's PT Cruiser was the vehicle the police were looking for. However, given that Officer Wheeler came on duty while the search for the suspect was already in progress, he was not "plainly incompetent"[5] in failing to elicit all of the details of the incident that were reported before his shift, or in failing to recognize immediately that the dark-colored PT Cruiser he spied from the helicopter could not have been the grey PT Cruiser for which the police were looking, especially given the inconsistencies in the reports he was receiving from officers on the ground. Officer Wheeler's mistakes were unfortunate, and they fall short of the ideal standards of diligence expected of officers searching at night by helicopter for suspects in vehicles in a large city. His lack of diligence directly resulted in the violation of Humphrey's rights. However, his mistakes were not so egregious that we would characterize them as plain incompetence or mistakes no reasonable officer would make in the circumstances. Accordingly, we conclude that Officer Wheeler is also entitled to qualified immunity for his actions in directing the stop of Humphrey's PT Cruiser.

## III. CONCLUSION

We agree with our dissenting colleague that the complaint alleges an unconstitutionally intrusive seizure and use of force. We also agree that if several police mistakes had not occurred, Humphrey would have been spared his brief ordeal.[6] However, all three defendant officers' individual mistakes were reasonable mistakes understandably committed in good faith while performing their job in a potentially dangerous situation. They are entitled to qualified immunity for those mistakes. *See Saucier*, 533 U.S. at 205. Accordingly, we **REVERSE** the ruling of the district court denying the defendant officers qualified immunity and **REMAND** for further proceedings consistent with this opinion.

---

[5] *Malley*, 475 U.S. at 341.

[6] This decision is without prejudice to plaintiff's right to appeal the district court's order granting summary judgment on the claims against the City of Columbus for failure to train, supervise, and discipline police officers and for ratification of improper police conduct.

---

**DISSENT**

---

CLAY, Circuit Judge, dissenting. In *United States v. Hensley*, 469 U.S. 221, 232-33 (1985) the Supreme Court stated that "the *objective* reading of [a] flyer or bulletin [] determines whether other police officers can defensibly act in reliance on it." *Id.* (emphasis added). Today the majority opinion blazes a new trail in our jurisprudence, allowing police officers to rely on communications that do not objectively establish a reasonable suspicion to detain a suspect. Contrary to the majority's view, the Fourth Amendment interests at stake with respect to qualified immunity require that the conduct of officers be judged by the objective information in their possession. A jury could find that it would have been clear to a reasonable officer in the shoes of Officers Mabry, George or Wheeler that the decision to seize Plaintiff (or order his seizure) was unlawful based on the information in their possession. Accordingly, I respectfully dissent, and would deny qualified immunity so that the case could proceed to trial.

**I.**

The question of whether Plaintiff's stop was supported by reasonable suspicion or probable cause is normally a question for the jury, unless there exists only one reasonable determination. *See Pyles v. Raisor*, 60 F.3d 1211, 1215 (6th Cir. 1995) (citing *Yancey v. Carroll County*, 876 F.2d 1238, 1243 (6th Cir. 1989)). Likewise, in determining whether Defendants should be granted summary judgment, this court must view all the facts in the light most favorable to Plaintiff. *Cockrel v. Shelby County Sch. Dist.*, 270 F.3d 1036, 1048 (6th Cir. 2001) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

In determining whether qualified immunity is appropriate, courts apply the two-step analysis delineated by the Supreme Court in *Saucier v. Katz*, 533 U.S. 194, 201-02 (2001). First, the court must ask whether, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Id.* at 201. If the defendant has not violated the plaintiff's constitutional right, the inquiry is at an end. *Id.* However, if the party asserting the injury was deprived of his constitutional rights, then the court must ask if that right was clearly established. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202. In determining whether a reasonable officer would have known that his conduct was unlawful, this Court looks first to the precedents of the Supreme Court, then to case law from this circuit, and finally to decisions from other circuits. *Baker v. City of Hamilton, Ohio*, 471 F.3d 601, 606 (6th Cir. 2006) (quoting *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 902 (6th Cir. 2004)). In order for a constitutional right to be clearly established, a court need not find that "the very action in question has previously been held unlawful," but only that the unlawfulness of the action was apparent in light of pre-existing law. *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). Even when confronting a novel factual situation, a reasonable officer is "on notice" that his conduct violates clearly established constitutional rights if the state of the law at the time of the alleged depravation provides "fair warning" that his actions are unconstitutional. *Id.* at 741.

This case again requires the Court to address problems arising from police communications. Effective police communication is essential to the task of law enforcement, and police must as a general rule be able to trust communications from their fellow officers without probing the source of that information. *See Hensley*, 469 U.S. at 231. Nevertheless, merely transmitting information from one officer to another does not transform bad information into good; a search that is not justified by "specific and articulable facts," see *Terry v. Ohio*, 392 U.S. 1, 21 (1968), does not become justified as such merely because officers have passed on baseless or erroneous information and

obfuscated its original source.  The Supreme Court in *Hensley* addressed this problem in the context of applying the exclusionary rule.  The Court held that when the reliability of information turns on a flyer or bulletin, "its admissibility turns on whether the officers who *issued* the flyer possessed probable cause."  469 U.S. at 231.  This rule was necessary because it "minimiz[ed] the volume of information concerning suspects that must be transmitted to other jurisdictions and enable[d] police in one jurisdiction to act promptly in reliance on information from another jurisdiction."  *Id.*  In dicta, the *Hensley* Court suggested that a different rule would apply in civil suits:

> If the flyer has been issued in the absence of a reasonable suspicion, then a stop in the objective reliance upon it violates the Fourth Amendment.  In such a situation, of course, the officers making the stop may have a good-faith defense to any civil suit. *It is the objective reading of the flyer or bulletin that determines whether other police officers can defensibly act in reliance on it.*

*Id.* at 232-33 (emphasis added) (citations omitted).

In *Feathers v. Aey*, 319 F.3d 843 (6th Cir. 2003), this Court faced the situation contemplated in *Hensley*.  An anonymous caller provided the police with a tip that "a white male with a beard on a porch on North Howard Street" who "looks like he is pretty drunk" had pointed "something" at him.  *Id.* at 846.  The police dispatcher instructed the officers to "check for a [suspicious person], supposed to be carrying a weapon . . . [he] is on the porch near the corner, it's a white male with a beard, no shirt."  *Id.*  The officers directed their attention to Feathers, who they felt matched the description, and who was shirtless on a porch on North Howard.  *Id.*  They approached Feathers, and the encounter led to a scuffle, after which the officers arrested Feathers.  *Id.* at 846-47.  The court held that although the anonymous tip did not establish a reasonable suspicion under *Florida v. J.L.*, 529 U.S. 266, 271 (2000), the officers were nevertheless entitled to qualified immunity based on the dicta in *Hensley*.  *Feathers*, 319 F.3d at 849-51.  Thus, while the totality of the information known to the police did not establish probable cause, the officers were entitled to qualified immunity because "[b]ased on the information that [the officers] had themselves" their behavior "was not objectively unreasonable."  *Id.* at 851.

This Court again applied this rule in the recent case of *Smoak v. Hall*, 460 F.3d 768 (6th Cir. 2006).  The unfortunate events in *Smoak* began when James Smoak left his wallet on the roof of his green station wagon while refueling at a gas station.  This led a caller to inform the police that she passed a dark green station wagon, "probably going 110 miles an hour," with "money flying all over the interstate."  *Id.* at 774.  In connection with an investigation of the scene, an officer sent a teletype asking area law enforcement if a "recent robbery" had occurred.  *Id.*  A series of miscommunications led officers to believe that the Smoaks had been involved in a robbery, and they were arrested in a "felony stop,"–a stop where police officers approached with guns and expected to encounter dangerous individuals–which precipitated a series of events in which officers injured James Smoak's knee and face and fatally shot the Smoaks' dog.  *Id.* at 775.  The court concluded that the high-risk felony stop was reasonable based on the information known to the officers who conducted the stop. *Id.* at 780.  Officer Bush, who had spotted the car and requested the presence of the other officers, had heard reports that the Smoaks' car was wanted in a "possible robbery."  *Id.* at 774.  And before making the arrest, he had checked with the Nashville Division of the Tennessee Highway Patrol and explicitly confirmed that it wanted the Smoaks' car stopped.  *Id.* at 774-75. Thus, though not explicit in its analysis, the *Smoak* court analyzed the information objectively before the officers in determining whether the officers acted reasonably in taking action which constituted a violation of the plaintiffs' constitutional rights.

## II.

I agree with the majority that the collective knowledge of the police, viewed in the light most

favorable to Plaintiff, establishes that the officers' seizure of Plaintiff violated his constitutional rights. The next step is to determine, based on the individual knowledge of the police officers, whether their actions violated Plaintiff's clearly established rights–specifically, Plaintiff's Fourth Amendment right to be free from unreasonable searches and seizures. U.S. Const. amend. IV. Where an individual is stopped and seized in an encounter that falls short of an arrest, as occurred here, the officers' actions must be supported by a reasonable suspicion. *United States v. Arvizu*, 534 U.S. 266, 273 (2002). A reasonable suspicion requires that, considering the totality of the circumstances, an officer have a "'particularized and objective basis' for suspecting legal wrongdoing." *Id.* (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). Officers must determine whether, based on "the cumulative information available to them," the likelihood of criminal activity rises to the level of a reasonable suspicion, which is more than a mere hunch but "falls considerably short of satisfying a preponderance of the evidence standard." *Id.* at 273-74. Without question, Plaintiff's right to be free from a seizure that was not founded on a reasonable suspicion was clearly established under binding precedent. *E.g. Terry*, 392 U.S. at 27. Also undisputed is the fact that Plaintiff's seizure was not based on such a reasonable suspicion. However, because the qualified immunity analysis must be conducted "in light of the specific context of the case," *Saucier*, 533 U.S. at 201, the Court must inquire as to whether "the contours of the right [were] sufficiently clear that a reasonable official would [have] underst[ood] that what he [was] doing violat[ed] that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). In this case, a reasonable officer would have known that his actions violated Plaintiff's Fourth Amendment rights.

## A. Officers Mabry and George

To reiterate, whether Officers Mabry and George violated Plaintiff's clearly established rights turns on the cumulative information available to them. *Arvizu*, 534 U.S. at 273. The communications that Officers Mabry and George relied upon in detaining Plaintiff's PT Cruiser bear repeating:

> [Officer Russell]: you may want to check for that PT Cruiser anywhere from Frebis/Parsons, all the way to Livingston and Parsons.
> [Officer Wheeler from the helicopter]: We got a PT Cruiser *dark grey*, southbound from the Kroger here on Parsons, that's probably it.

J.A. at 190 (emphasis added).

The fact that the PT Cruiser being searched for was dark gray was not the only reason that the officers had to suspect that Plaintiff's bright-blue PT Cruiser was not the car they were seeking. Officer George testified to the following at his deposition:

> Q. Had you been given a license plate number? Was that aired?
> A. Yes, but I believe they said it was the wrong plate so don't go by that information.
> . . .
> Q. Do you remember if you even heard a license plate before the time that you stopped Mr. Humphrey?
> A. Before I think they–Like I said, I think they aired it and then they said that was not a good license plate because I think it came back to a different vehicle.

J.A. at 238-39.

The very same communication that informed Officers Mabry and George that the PT Cruiser was "probably it" also informed them that the PT Cruiser was "dark grey." In the nighttime, from 300 to 500 feet above the ground, a bright-blue PT Cruiser could conceivably appear dark gray; on the ground, Officers Mabry and George could easily discern that the PT Cruiser was in fact bright blue. The officers also knew that the vehicle they were about to detain–with guns drawn–did not

have a license plate that matched the suspect's vehicle. Also undisputed is the fact that Plaintiff was patiently stopped in line of cars; he was not trying to flee or acting in a dangerous manner. Thus, the particularized inquiry is whether it would have been clear to reasonable officers in the situation confronting Officers Mabry and George that a reasonable suspicion did not arise from a single statement–"that's probably it"–where the statement contained patently false facts as to the description of the car and no exigent circumstances existed. Our precedents clearly establish that this stop was unlawful.

The following propositions of law are beyond dispute. First, an officer's reliance on communications from his fellow officers is not *per se* reasonable; instead such reliance is only reasonable to the extent that it is justified by an objective interpretation of those communications. *See Hensley*, 469 U.S. at 232-33; *see also Rogers v. Powell*, 120 F.3d 446, 455 (3d Cir. 1997) ("[W]here a police officer makes an arrest on the basis of oral statements by fellow officers, an officer will be entitled to qualified immunity from liability in a civil rights suit for unlawful arrest provided it was objectively reasonable for him to believe, on the basis of the statements, that probable cause for the arrest existed."). Second, it is unreasonable for an officer to rely on reported information that he knows to be false or that is contradicted by his direct observations when determining whether probable cause exists. *See Fisher v. Harden*, 398 F.3d 837, 843 (6th Cir.), *cert. denied*, 126 S. Ct. 828 (2005). Third, when determining whether probable cause exists, "an officer cannot look only at the evidence of guilt while ignoring all exculpatory evidence." *Gardenhire v. Schubert*, 205 F.3d 303, 318 (6th Cir. 2000); *Fisher*, 398 F.3d at 843. Likewise, whether a reasonable suspicion exists depends on the totality of the circumstances. *Arvizu*, 534 U.S. at 273.

In light of this established precedent, a jury could find that reasonable officers in the position of Officers Mabry and George would have known that it was unlawful to focus solely on Officer Wheeler's statement "that's probably it" while ignoring the rest of the information in Officer Wheeler's statement that suggested that Plaintiff's car was probably *not* it. It was clearly unlawful for Officers Mabry and George to rely upon the oral communications that were transmitted to them by Officer Wheeler because such reliance was not justified based on an objective review of Officer Wheeler's communications and the surrounding circumstances. While Officer Wheeler identified with specificity a vehicle to be stopped, his description of the vehicle was patently incorrect as to its color–which was the only characteristic Officer Wheeler used to describe Plaintiff's PT Cruiser. His description of the vehicle was thus contradicted by the direct observations of Officers Mabry and George. And Officer George stated that he knew from previously-aired police reports that the vehicle containing the suspect was dark colored.[1] No reasonable officer would have failed to put two and two together: The fact that the suspect's vehicle was dark colored plus the fact that Officer Wheeler thought that a bright-colored vehicle was dark colored equaled the unavoidable conclusion that Officer Wheeler was mistaken. Nevertheless, the officers ignored this conclusion and erroneously determined that a reasonable suspicion existed to stop Plaintiff's vehicle.

A reasonable jury could conclude that Officers Mabry and George were plainly incompetent for detaining a bright-blue PT Cruiser with the wrong license plate despite the fact that an officer in a helicopter told them that a dark-gray PT Cruiser on the ground was "probably it." *See Scott v. Clay County*, 205 F.3d 867, 873 n.9 (6th Cir. 2000). The officers admittedly had no other information causing them to suspect that Plaintiff's vehicle contained Dunson, the suspect being searched for. I would reverse the district court's grant of summary judgment in favor of Plaintiff–a jury *could* conclude that the officers' errors were reasonable–but a jury could also conclude that it was inexcusable for Officers Mabry and George to disregard the exculpatory facts in front of their noses. Courts have been understandably reluctant to shield defendants with qualified immunity where the

---

[1] In his affidavit, Officer George stated that he did "recall hearing that there was a gun used in criminal activity on board a *dark PT Cruiser . . .*" J.A. at 71 (emphasis added).

defendants' mistakes stem from their cognitive failings as opposed to uncertainty in the law. *See, e.g.*, *Groh v. Ramirez*, 540 U.S. 551, 564, 567 (2004) (reversing summary judgment on the basis of qualified immunity where "even a cursory reading of the warrant . . . would have revealed a glaring deficiency" over the dissent's protests that "the officer simply made a clerical error"); *Dawkins v. Graham*, 50 F.3d 532, 534-35 (8th Cir. 1995) (denying qualified immunity where officers accidently searched the wrong house); *Bibart v. Stachowiak*, 888 F. Supp. 864, 868 (N.D. Ill. 1995) (refusing to grant qualified immunity where the dispatcher failed to correctly read a computer screen). Whether Officer Mabry's and George's failure to analyze the facts before them rises to the level of incompetence is properly a factual issue for the jury. *See Dawkins*, 50 F.3d at 534.

Moreover, this is not a case where exigent circumstances justified the officers' failure to follow up on the incorrect information before them. The opportunity to stop Plaintiff would not have evaporated in the seconds it would have taken Officers Mabry or George to radio back the message, "This PT Cruiser is bright blue. Should we still detain it?" Plaintiff was sitting patiently in a line stopped cars, and gave no indication that he would attempt to evade or elude police. In light of these circumstances, a jury could find that no reasonable officer in the position of Officers Mabry and George would have decided to immediately pursue the stop.

In concluding that no reasonable jury could find that Officers Mabry's and George's actions violated Plaintiff's clearly established rights, the majority glosses over the facts known to the officers that suggested that they had the wrong car. According to the majority, the officers had a "sufficient" factual basis to believe that they were in compliance with the law. Majority Op. at 8. This is because, though it is "possible to fault Officers Mabry and George for seizing a bright blue PT Cruiser" despite the fact that the transmission asking them to seize it identified the car as dark gray, Officer Wheeler had said that the car was "probably it" and the officers believed that the driver was armed. Majority Op. at 9. This analysis cannot be reconciled with our case law because it allows the police to rely on communications which were objectively and unquestionably false. The majority offers no reason that justifies the officers' failure to follow up on this incorrect information, despite the fact that the officers had the time and ability to make such an inquiry. While the majority points to many facts that the Columbus Police Department confused over the course of the evening, Majority Op. at 8, it is clear that Officers Mabry and George knew or should have known that the car that Officer Wheeler described from the helicopter was drastically different from the car that they stopped.

Additionally, the majority attempts to dismiss the fact that Plaintiff's license plate bore no resemblance to Dunson's license plate, arguing that Officers Mabry's and George's failure to consider such information was reasonable because the license plate number reported by the victim was registered to a different owner. This argument is unconvincing. Plaintiff's license plate number (AUN1NX) shared not a single character in common with the reported license plate number (CFT2945), which, as the officers admit, was aired over the police radio. It is highly unlikely that a witness reporting a license plate number would get seven out of seven characters incorrect; this glaring discrepancy strongly suggested that Plaintiff's vehicle was not Dunson's vehicle. Unsurprisingly, when the actual vehicle was located, its license plate number (CFP2945) was strikingly similar to that reported by the witness.

The majority also asserts that "[a] reasonable officer could have concluded that a suspect driving away from the scene of a crime where a gun was brandished creates a circumstance that is as exigent as a police confrontation with an armed robbery suspect." Majority Op. at 8 (citing *Smoak*, 460 F.3d at 774-75). One need not quibble with this statement, as it bears little resemblance to the facts of this case. Plaintiff was not "driving away from the scene of a crime;" he was stopped in a line of parked cars. And as the "crime where a gun was brandished" had occurred over forty minutes ago, this was not a case of hot pursuit. Moreover, *Smoak* provides only tepid support for Defendants. Officer Bush, a defendant in *Smoak*, had explicitly confirmed that the Smoaks' car was the car to be

stopped, after following the Smoaks for over eight miles. *Smoak*, 460 F.3d at 774-75. Officers Mabry and George here could have averted the situation by taking the time to confirm that Plaintiff's vehicle was to be stopped notwithstanding the factual inaccuracies in Officer Wheeler's communications. This course of action would have taken far less time than that needed for the pursuit in *Smoak*.

A jury could also conclude that no reasonable officer would have failed to obtain a description of the actual suspect before stopping Plaintiff and forcing him out of his vehicle at gunpoint. The physical descriptions of Plaintiff and the suspect, Dunson, are starkly different. Plaintiff is fifty-two years old; he is five-feet, six-inches tall; he weighs approximately one-hundred and sixty pounds; he had a short, graying beard and a very short hairstyle. On the night in question, Plaintiff was wearing his City of Columbus work clothes and an identification badge. Dunson, as reported by police dispatch, was nineteen years old; approximately six-feet, three-inches tall; he weighed approximately two-hundred and fifteen pounds; he had short, curly hair and a goatee. He was wearing a black jersey with red and white lettering. The only reported similarities between Dunson and Plaintiff were that they were both black males–which, according to Officer George, were the only aspects of the suspect's physical appearance that he could recall at the time of the arrest, notwithstanding the fact that a more detailed description of Dunson was aired contemporaneously to the radio transmissions describing his race and sex.[2] Of course, Officers Mabry and George did not need to rely on their memories for a description of Dunson: With Plaintiff's vehicle sitting in stopped traffic, there was ample time for the officers to obtain an accurate description over the radio, which could have been accomplished in a matter of seconds. Yet despite the ease with which Officers Mabry or George could have obtained a physical description of Dunson, the majority inexplicably forgives their failure to do so, again glossing over their conduct by stating that it was reasonable. Absolving Officers Mabry and George in this manner is wrong for two reasons. First, their mistake in relying on Officer Wheeler's communications was patently unreasonable. Complete communications were transmitted, and the officers acted incompetently when they stopped Plaintiff after only hearing–or, more likely, choosing only to focus upon–the very general descriptors of race and sex that matched Plaintiff and Dunson, while ignoring the more specific information of clothing, height, weight, and age that differentiated them. Second, more importantly, Officers Mabry and George acted as no reasonable officer would in failing obtain an available physical description of the suspect before making a hostile and threatening stop, even though there were no exigent circumstances which justified a stop on such flimsy information. This lack of exigent circumstances differentiates the instant case from both *Feathers* and *Smoak*, where the police were provided with information from witnesses suggesting exigent circumstances requiring immediate action. *See Feathers*, 319 F.3d at 846 (officers were face to face with suspect who, despite repeated requests, refused to keep his hands out of his pockets); *Smoak*, 460 F.3d at 774-75 (officer was following suspect's vehicle and confirmed that the vehicle

---

[2] Officer George stated that the only physical information he knew about the suspect at the time he stopped Plaintiff was that the suspect was a black male. In his affidavit, Officer George stated that he did "recall hearing that there was a gun used in criminal activity on board a dark PT Cruiser with a male black driver." J.A. at 71. Similarly, at his deposition, Officer George, when asked if he had heard anything "having to do with [the suspect's] race or age or height or weight or any of those characteristics" responded "[j]ust that it was a male black." J.A. at 238.

The record reflects the following description of the suspect was first aired:

Dispatcher:  If you guys can help me out on 11 precinct on a 33 run to 795 Thurman Avenue, male black, 6'3", in a grey Chrysler, CFT2945, has a 33 out and is threatening caller's father.
Police:  131 I copy; 133 I copy.
Dispatcher:  Be advised this is going to be the sister's ex-boyfriend, his name is Greg Dunson. He left his car there and just now took off walking down the street, I don't have any clothing on him.
Police:  133, what's the cross street?
Dispatcher:  Between Gilbert and 22nd. I have a description on him now, he is wearing a black jersey with white and letter, and red lettering.

J.A. at 178.

and its occupants were suspected of a robbery).  Unlike *Feathers* and *Smoak*, a reasonable jury in the instant case could find that Officers Mabry's and George's conduct would be clearly unlawful to a reasonable officer in the situation they confronted.  *See Saucier*, 533 U.S. at 202.

## B.  Officer Wheeler

Although Officer Wheeler presents a closer case, a reasonable jury could find that Officer Wheeler violated Plaintiff's clearly established rights by misidentifying his PT Cruiser.  Immediately preceding Officer Wheeler's decision to have Plaintiff's PT Cruiser detained, the following transmissions were broadcast:

> [Officer Smith]:  116–you should advise our suspect on our 33 run was just seen in the PT Cruiser Westbound on Frebis from Ohio.
> . . .
> Police:  136–Yes ma'am, I'll go eastbound on Frebis from Parsons.
> . . .
> [Officer Russell]:  you may want to check for that PT Cruiser anywhere from Frebis/Parsons, all the way to Livingston and Parsons.

J.A. at 190.

The officers thus delineated a rectangular area in which the helicopter should have looked for the PT Cruiser.  This area was bounded by Parsons Avenue (which runs north/south) and Livingston Avenue (which runs east/west) in the northwest; and Frebis Avenue (which runs east/west) and Ohio Avenue (which runs north/south) in the southeast.  This area is approximately two-thirds of a square mile, and contains several major roads in southern Columbus. The address where Plaintiff's PT Cruiser was spotted was two blocks outside of this area.

Worse still, the objective information available to Officer Wheeler made it highly unlikely that the PT Cruiser he identified was the PT Cruiser that was described by Officer Russell.  At 10:33 p.m., the PT Cruiser that Officer Wheeler was advised contained the suspect was seen "Westbound on Frebis from Ohio."  Next, a second officer advised that he would head "eastbound on Frebis from Parsons"–meaning that he was heading directly to the suspect's vehicle.  Nevertheless, within a minute, and without hearing anymore from the officer heading eastbound on Frebis, Officer Wheeler honed in on a car that was leaving the parking lot of a grocery store that was two-thirds of a mile away from where the suspected PT Cruiser was purportedly being driven.

At his deposition, Officer Wheeler admitted that he did not instruct Officers Mabry and George to pull over Plaintiff's PT Cruiser because of any characteristic about that PT Cruiser (beyond its incorrectly-identified dark color); instead, Officer Wheeler suggested that he would have focused on any PT Cruiser he observed in the general vicinity–how far outside the reported area is unknown, as Officer Wheeler had already ventured outside of the area in which he was instructed to look for the PT Cruiser.  As Officer Wheeler testified at his deposition:

> Q. . . . [I]f you had seen two dark PT Cruisers on that street, would it have been your thought that proper police procedure would be to stop them both and check?
> . . .
> A.  That's correct.  Had I seen two PT Cruisers on the Kroger lot, I would have aired both of them and attempted to get both of them stopped, based on the PT Cruiser and what I thought was gray from the air.

J.A. at 258-59.

As the majority correctly concludes, a reasonable suspicion requires that an officer point to a particularized and objective basis that "leads him reasonably to conclude in light of his experience that criminal activity may be afoot." *Terry*, 392 U.S. at 30-31. There is little dispute here that this standard was not satisfied with respect to Plaintiff's vehicle. Nevertheless, the majority concludes that it was reasonable for Officer Wheeler to order Plaintiff's car detained because it was in the "limited geographic area where he had just been instructed to look." Majority Op. at 18.[3] This Court has never held, however, that any common car of the same model and general color in a large geographic area can be seized or searched where officers have a reasonable suspicion for searching a specific, single vehicle–to do so would violate *Terry*'s clearly established requirement that a stop be justified by particularized and objective facts. Our cases upholding vehicle stops have consistently required a particularized identification of the suspect's vehicle. *See, e.g.*, *United States v. Marxen*, 410 F.3d 326, 331 (6th Cir. 2005), *cert. denied*, 126 S. Ct. 1445 (2006) (reasonable to stop vehicle used as getaway car where police had a description of the vehicle including license plate); *Houston v. Clerk County Sheriff Deputy John Does 1-5*, 174 F.3d 809, 814 (6th Cir. 1999) (reasonable to stop cars based on mistaken car-counting practice). Here, a reasonable jury could certainly conclude that no reasonable officer confronting the objective facts known to Officer Wheeler would have considered it lawful to instruct other officers that Plaintiff's car was "probably" the car they were seeking. The geographic area in which Officer Wheeler was looking was large–the delineated area was approximately two-thirds of a square mile, and Officer Wheeler was additionally searching outside of this area. The car Officer Wheeler focused upon was two-thirds of a mile away from the area where the suspect was seen one minute prior, and was leaving a grocery store parking lot. Moreover, there was another officer on the road on which the suspect was purportedly driving between the suspect and the grocery store. That a suspect left the major road upon which he was traveling, zipped through the back roads of the city, covered two-thirds of a mile in less than a minute and then inexplicably entered the parking lot of a grocery store is a factual scenario that defies belief. To look at these facts and assume, as Officer Wheeler did, that the car leaving the grocery store was "probably" the suspect's car was plainly incompetent police work.

Of course, to say that Officer Wheeler violated Plaintiff's clearly established rights in radioing that Plaintiff's car was "probably it" does not mean that Officer Wheeler was powerless to investigate Plaintiff's PT Cruiser. Had Officer Wheeler, for example, told officers on the ground that Plaintiff's car should be investigated, following that information with a description of the suspect, the officers on the ground could have easily dispelled any suspicions that they had concerning Plaintiff's vehicle without effectuating a stop. Such a course of action would have been entirely proper–and would not have resulted in a violation of Plaintiff's Fourth Amendment rights. Law enforcement officers undoubtedly have an interest in investigating any potential lead to arrest a suspect who has committed a dangerous crime. But the intrusiveness of a stop cannot be gainsaid, and it is the Fourth Amendment's requirement of reasonable suspicion that protects citizens from unnecessary intrusions when law enforcement interests are not sufficiently weighty to tip the balance of the Fourth Amendment's scales. *See Terry*, 392 U.S. at 24-27. In this case, a jury could find that Officer Wheeler violated Plaintiff's clearly established rights by casting too wide a net in response to the objective information he received.

### III.

Because a reasonable jury could find that Officers Wheeler, Mabry, and George violated Plaintiff's clearly established rights, I would allow this case to be submitted to a jury. While the police need not cross-examine their fellow officers while pursuing a suspect, they also cannot turn

---

[3] The majority's description of the geographic area as "limited" is deceptive. While the officers instructing Officer Wheeler where to search did demarcate limits, as discussed above, Plaintiff's car was outside of those limits when Officer Wheeler identified it. If Officer Wheeler's search was in fact "limited" in his own mind to a specific geographic area, those limits had no basis in the communications he received from his fellow officers.

a blind eye towards relevant information that dispels a reasonable suspicion. Under the second prong of the *Saucier* test, no reasonable officer would have thought that a person driving a bright-blue PT Cruiser and fitting the physical description of Humphrey could be Dunson, the man for whom the police were actually searching. Accordingly, I respectfully dissent.